[Crim. No. 491. Fifth Dist. Nov. 20, 1968.]

THE PEOPLE, Plaintiff and Appellant, v. DONALD L. McKEE, Defendant and Respondent.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Deputy Attorneys General, for Plaintiff and Appellant.

Kane & Canelo, Thomas J. Kane, Jr., and James R. Haughey for Defendant and Respondent.

GARGANO, J.—On November 20, 1967, the district attorney of Mariposa County filed a complaint in the Justice Court of the Mariposa Judicial District charging respondent, Donald L. McKee, with murder in the first degree. At the conclusion of the preliminary hearing the magistrate ordered respondent to answer to a charge of involuntary manslaughter; involuntary manslaughter was the only offense named in the order of commitment. On December 14, 1967, the district attorney filed an information in the Mariposa County Superior Court again charging respondent with murder. Respondent then moved to dismiss the information under Penal Code section 995. The superior court, however, did not precisely rule on this motion. Instead, the court directed the district attorney to file an amended information charging respondent with involuntary manslaughter. The People appeal from this order.

The facts, as gleaned from the transcript of the preliminary hearing which was conducted in the justice court, are substantially as follows.

On Thursday, November 1, 1967, respondent, a captain in the United States Air Force, went on a hunting trip with six other air force officers. The hunting party camped in the Chowchilla mountain area of Mariposa County. On the following Sunday morning at about 5:45 a.m. the group left camp on foot to hunt. Respondent and Lieutenant Haren were the first to leave. They walked to an area called the "point" about a half-mile from the camp. Respondent took a position

at a stump, and the lieutenant took his position at a log approximately 153 feet uphill from the stump (see diagram below).

Shortly after 6 a.m. the other hunters who had taken positions nearby heard a shot. About ten minutes later three more shots were fired in rapid succession. The first shot came from a rifle and the other three from a pistol. All shots seemed to come from the direction of the "point."

A few moments after the pistol shots were fired Captain Wheeler, a member of the hunting party, saw respondent running toward him. Respondent said, "I shot a man." Captain Wheeler asked, "Who?"—and respondent answered,

"Ron." Then Captain Wheeler fired four "ragged shots" to alert the remainder of the party. These shots were heard by the other hunters about ten minutes after the first series of pistol shots. No other shots were heard in the vicinity during this time by the hunting group nor were any other persons seen.

Subsequently, several hunters went to the "point" to investigate. They found Lieutenant Haren's body downhill from the log on its back, head lying on the right ear, feet crossed, the hands on the victim's rifle. The rifle was propped against the log. The lieutenant's red hunting cap was near an evergreen tree approximately 27 feet downhill from the body (see diagram). Neither the body nor the hat were touched. However, one of the hunters returned to the stump and retrieved respondent's rifle. It was a .270 caliber Winchester equipped with a six-power telescopic sight. The hunter unloaded the rifle and found it had one less cartridge than capacity in the magazine.

Later, police investigators found finely sprayed blood in an area around a log and bone tissue and blood on the log and the ground. Three tree limbs, which had been clipped off 34 inches from the ground, were found uphill 6 to 18 feet from the body. The limb nearest the body showed traces of lead and blood. The line formed by the three clipped-off limbs varied five degrees from the direct line between the log where the body was found and the stump where respondent claimed he was standing (see diagram).

Respondent rode to Mariposa with the coroner who was also sheriff of Mariposa County. He related that upon arriving at the "point" the decedent took a stand at a log uphill from the stump where defendant took his stand. After a short wait he saw a deer in a clearing approximately 75 to 95 feet from his position. The deer was to the right of Lieutenant Haren's position (see diagram). Respondent said he did not have "buck fever" and carefully sighted the standing deer in the scope of his rifle. Then he fired. He waited ten minutes and then went to look for the deer. Instead he found Lieutenant Haren's body, but did not touch it. He fired three shots in the air with his pistol and went to find the others.

The post-mortem examination of Lieutenant Haren's body revealed that the complete top portion of the skull had been blown away. There was a small punched-out wound in the scalp over the right ear. A 5-inch square area by the left eye was missing, and about 75 percent of the brain tissue was gone. The pathologist who made the examination opined that

a small metalic object, 6 or 7 millimeters in diameter, entered the skull over the right ear and then burst into multiple fragments that exited over the left eye.

Both sides apparently agree that the court's order directing the district attorney to file an amended information charging respondent with involuntary manslaughter was tantamount to a dismissal of the murder charge even though the court did not dismiss this charge in precise words. However, the order is nevertheless equivocal and raises a jurisdictional question which appellant asks us to resolve before we direct our attention to its main arguments for reversal. Albeit it is clear under Penal Code section 1238 that an order dismissing an information is appealable, it is questionable as to whether an order merely directing the district attorney to file an information charging a lesser or different offense is also appealable under this or any other section of the Penal Code. It is settled that the right to appeal from an order or judgment in a criminal case is purely statutory, and ''. . . no appeal by the People is proper unless expressly permitted by the Penal Code.'' (*People* v. *Hale*, 232 Cal.App.2d 112, 125 [42 Cal.Rptr. 533].)

We conclude that the court's order was for all intents and purposes a dismissal of the murder charge and should be so treated in this appeal. The court directed the district attorney to file an amended information charging respondent with involuntary manslaughter after stating that there was not sufficient evidence to hold respondent on a murder charge.[1] Thus, the court's failure to dismiss the murder charge in so many words was an oversight which we may safely ignore. Moreover, manslaughter is a lesser but necessarily included offense of the crime of murder, and it was already possible for a jury to convict the respondent of this lesser offense even though it was not charged in the information. Therefore, the trial judge performed an idle act when he ordered the district attorney to amend the information unless he also intended to dismiss the murder charge. It is a cardinal rule that an appellate court will not presume that a trial judge performed an idle act if some other reasonable construction is clearly warranted by the record. (See *Lavine* v. *Jessup*, 48 Cal.2d 611, 614-615 [311

---

[1] The court order reads in pertinent part as follows:

''The court finds there is not sufficient evidence to hold the defendant to answer to the charge of Murder.

''District Attorney directed to file an amended Information charging defendant with violation of Penal Code Section 192, Involuntary Manslaughter, a felony, within 15 days.''

P.2d 8] ; *B.F.G. Builders* v. *Weisner & Coover Co.,* 206 Cal. App.2d 752, 758 [23 Cal.Rptr. 815].)

We shall now direct our attention to appellant's main contention for reversal of the court's order. Briefly, appellant maintains that there was sufficient evidence to hold respondent on the murder charge and that the superior court erred in its application of the rules governing the kind of review to be given the evidence adduced at respondent's preliminary examination.

We conclude that when a district attorney files an information in the superior court, containing an offense not included in the commitment order signed by the magistrate who conducted the preliminary examination on the initial complaint, the court must uphold the information if the evidence adduced at the preliminary hearing is sufficient to support the new or additional charge (*People* v. *Azevedo,* 218 Cal.App.2d 483 [32 Cal.Rptr. 748]). In short, under Penal Code section 739[2] the district attorney is not bound by the view of the committing magistrate; he is free to file an information charging the highest offense which any reasonable construction of the evidence adduced at the preliminary hearing admits (*People* v. *McGee,* 31 Cal.2d 229 [187 P.2d 706]). Thus, when section 739 and Penal Code section 995 are read conjointly, it follows that the superior court is likewise not bound by the view of the committing magistrate; it too should uphold the information as to any offense charged in the information of which any reasonable construction of the evidence adduced at the preliminary hearing admits. In other words, if the defendant moves to dismiss the information under these circumstances, the question of his guilt or innocence is not before the court nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. On the contrary, the court should decide from the evidence adduced at the preliminary hearing, without attempting to reconcile conflicts or judge the credibility of the witnesses, whether there is reasonable or probable cause to believe the defendant guilty of the offense charged. And, there is sufficient evidence to require the superior court to deny

[2]Section 739 of the Penal Code provides in pertinent part as follows: ''When a defendant has been examined and committed, as provided in Section 872, it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county within 15 days after the commitment, an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed.''

defendant's motion if it raises a clear and distinct inference of the existence of the essential elements of the crime charged (*People* v. *Azevedo, supra,* 218 Cal.App.2d 483).[3]

We conclude that the court erred when it dismissed the information charging respondent with the crime of murder. The evidence adduced at the preliminary hearing leads to the inescapable conclusion (as both the magistrate and superior court judge obviously found) that Lieutenant Haren was killed by a shot fired by respondent from respondent's hunting rifle. Then, having cleared this essential hurdle of the corpus delicti, the evidence in this case raises a clear and distinct inference that the shooting was not accidental but intentional and, hence (since no justifying or mitigating circumstances were shown), that the killing was with malice aforethought. (*Jackson* v. *Superior Court,* 62 Cal.2d 521 [42 Cal. Rptr. 838, 399 P.2d 374]; *People* v. *Craig,* 49 Cal.2d 313, 319 [316 P.2d 947]; *People* v. *Torres,* 94 Cal.App.2d 146 [210 P.2d 324].)

First, respondent's admission that he fired the shot which killed Lieutenant Haren is buttressed by the other convincing evidence. No other shots were heard by the members of the hunting party, no one else was seen in the area, and a game warden testified that the terrain and heavy forests would make it impossible for the fatal shot to have come from an area other than the vicinity in which respondent said he was positioned. Moreover, the clipped off branches were lying uphill from the body (see diagram), and the branch nearest the victim had traces of blood and lead smears; but the branch farthest from the victim had no discernible blood or lead smears. This critical evidence alone proves that the shot came from downhill and from the general direction in which defendant was positioned.

Second, the circumstances surrounding the shooting negate an accident. Respondent is an excellent shot, his rifle was accurate, the six-power scope was properly sighted, and he related that the motionless deer was standing broadside in a clearing at a distance of only 75 to 95 feet. Moreover,

[3]In *People* v. *Azevedo, supra,* the defendant, among other crimes, was charged with receiving stolen property in violation of Penal Code section 496 albeit this offense was not included in the commitment order signed by the magistrate who had conducted the preliminary examination. Defendant's Penal Code section 995 motion was granted by the superior court. The appellate court reversed the superior court on the grounds that the evidence adduced at the preliminary hearing was sufficient to establish reasonable or probable cause to believe the defendant guilty of the crime charged by reasonable and logical inference.

respondent said he could see the whole deer, aimed two inches behind the left front shoulder of the deer and fired while in a crouched steady position with his gun resting on his knee. But, mysteriously, the shot missed the deer entirely and then, through an incredible and highly improbable maneuver, ricocheted upward through a densely brushed and wooded area and hit Lieutenant Haren. And to add to the highly suspicious circumstances, no fresh deer tracks were found in the vicinity, respondent waited approximately ten minutes before investigating whether he hit the deer, and his statements to the sheriff were contradictory. Respondent stated he heard no other shots in the area. Later he said he heard shots from the area of the Tioga Girl Scout Camp.

Third, the expert testimony further fortifies the web of suspicion weaved by the prosecution. A criminologist testified that the deflection of the bullet required to hit Lieutenant Haren, who was positioned at an angle of 30 or more degrees to the left of the deer (see diagram) should have caused such an energy loss to the projectile as to preclude the occurrence of the extensive damage found in the victim's skull and the clipping off of the branches, the furthest of which was found approximately 18 feet from the victim's head. He also stated that a deflected bullet is deformed and will tumble or wobble in flight and would ordinarily make a larger entrance wound than the 6 or 7 millimeter punched conical entrance wound found in the victim's head. And, significantly, the criminologist could not explain how the brain tissue, a skull fragment and the victim's red hunting cap could have been found 27 feet below the body unless the body was moved or the evidence tampered with; he opined that it was highly improbable that this phenomenon could have been caused by the exploding effect of the victim's skull.

In view of the foregoing, we do not find it necessary to answer appellant's remaining contentions.

The order is reversed.

Stone, Acting P. J., concurred.

A petition for a rehearing was denied December 19, 1968, and respondent's petition for a hearing by the Supreme Court was denied January 15, 1969.