[No. D060457. Fourth Dist., Div. One. Nov. 20, 2012.]

THE PEOPLE, Plaintiff and Appellant, v.
SAUL BARBA et al., Defendants and Respondents.

**COUNSEL**

Bonnie M. Dumanis, District Attorney, Laura E. Tanney, Chief Deputy District Attorney, Gary W. Schons and Linh Lam, Deputy District Attorneys, for Plaintiff and Appellant.

Jerry D. Whatley; John L. Staley; and Susan S. Bauguess, under appointments by the Court of Appeal, for Defendants and Respondents.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

The People appeal from an order of the trial court dismissing count 1 of the information, which alleged that defendants Saul Barba[1] and Jessica Jean Lofgreen violated Penal Code[2] section 530.5, subdivision (a) by engaging in a check forging scheme in which they cashed stolen checks at multiple check cashing stores. Section 530.5, subdivision (a) makes it unlawful to willfully obtain personal identifying information of another person and use that information for any unlawful purpose. The trial court dismissed this charge

---

[1] The complaint and subsequent information identified this defendant as Saul Barba, although, according to his defense attorney, Barba's full name is Saul Barba Hinojosa. We will refer to the defendant as Barba.

[2] Further statutory references are to the Penal Code unless otherwise indicated.

on the ground that the evidence presented at the preliminary hearing did not demonstrate that the defendants had portrayed themselves to be anyone other than themselves while participating in the check forging scheme.

The People argue that section 530.5, subdivision (a) does not require that a defendant have personated another individual in using someone else's personal identifying information, and that the trial court erred in so interpreting the statute and dismissing the charge.

We agree with the People that the trial court erred in interpreting section 530.5, subdivision (a), and reverse the court's order.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*[3]

On April 18, 2011, Aaron Ashby parked his vehicle and left it unlocked with the windows rolled down. The following day, Ashby returned to the vehicle and found that someone had taken a checkbook and files from his business, Ashby Remodeling & Services, from the car. Ashby's company's name, the company phone number, a checking account number, bank name, and bank routing number were printed on the checks.

Ashby called his bank to cancel the checks. When the police later contacted Ashby to ask whether he knew any of the three defendants, he said that he did not know them, and also that he had not given any of those people permission to possess his checks.

Around April 21, 2011, Barba entered the Lakeside Discount Market and presented a check to the clerk for cashing. The clerk remembered that the check Barba handed over was a business check that had the word "Ashby" on it, and that the business involved construction. The check was No. 029, which was one of the checks stolen from Ashby's vehicle. The check was dated April 18, 2011, and had been made payable to Saul Hinojosa in the amount of $250. The notation on the check read "materials/labor," and the check had a signature on it.

The clerk did not verify the authenticity of the check but made a copy of the check before cashing it. The clerk had seen Barba in the store on prior occasions and believed that Barba had cashed checks in the store before.

---

[3] Because this appeal arises after the trial court dismissed count 1 as to both defendants prior to trial, we take the factual background from the testimony presented at the preliminary hearing.

Barba later returned to Lakeside Discount Market to cash check No. 039. He was accompanied by Claudia Lizethe Aguilera, who is Barba's wife. The check was made out to Aguilera in the amount of $600. The clerk photocopied the check and also made a copy of Aguilera's identification card. The check had a signature on it. After receiving the check from Aguilera and Barba, the clerk called the telephone number that was printed on the check. When there was no answer, Barba told the clerk that he had the business owner's cell phone number. The clerk called that number and left a message stating that he wanted to verify the check that Barba and Aguilera had provided to him. Shortly after the clerk left this message, a woman called the clerk back from a telephone number that came up on the clerk's caller identification as "private." The clerk told the woman that he could not verify the check from a telephone number that was blocked on his caller identification. The woman hung up and called back. This time, the telephone number was displayed. The clerk asked the woman if she had issued the check that Barba and Aguilera were trying to cash, and she said that she had. The clerk proceeded to cash check No. 039 for Barba and Aguilera.

On April 21, 2011, Barba entered a store called "The Check Cashing Place" and attempted to cash another one of the checks stolen from Ashby's vehicle. The check was dated April 20, 2011, was made payable to Saul Hinojosa in the amount of $600, and was signed. When Barba handed the check to the clerk, he also handed over an identification card in the name of "Saul Barba Hinojosa." The clerk called the telephone number printed on the check but received no answer. The clerk asked Barba for another contact number for the check issuer. Barba provided a different telephone number, which the clerk called. The clerk spoke to a woman whose name she could not recall, although she remembered that the woman said she had the same last name as the name that was printed on the check.

The clerk then called her manager, who questioned the story that Barba had provided to the clerk about why he received the check. The manager told the clerk to further investigate whether the check was authentic. The clerk searched for another telephone number for Ashby Remodeling & Services, and found a different number, which she called. The clerk spoke with Ashby, who told the clerk that the check was one of a number of checks that had been stolen. Ashby informed the clerk that he would come to the store. After speaking with Ashby, the clerk called the police.

Officer Roberto Bonilla responded to the clerk's call regarding a stolen check. When he arrived at the store, Bonilla observed Barba facing the clerk's window. Bonilla asked Barba to verify his identity. The clerk gave the stolen check to the officer, and the officer verified that the account holder for the check was Aaron Ashby. When Ashby arrived at the store, he explained to the officer that the checks had been stolen from his vehicle.

Officer Anthony Kolombatovic also went to The Check Cashing Place to investigate the report of a stolen check. When he saw that other officers were already inside the store, Kolombatovic looked around the store's parking lot to see whether there were any other individuals who may have accompanied Barba to the store. Kolombatovic noticed a brown van in the parking lot. He approached the van to investigate and discovered three people in the van: Aguilera, a female juvenile, and Lofgreen. Officer Kolombatovic asked Lofgreen to step out of the van so that he could speak with her. During their discussion, Lofgreen told Kolombatovic that she had disposed of several checks in a nearby trash can. Kolombatovic retrieved a number of items from the trash can, including three checks that were not Ashby's, two of Ashby's checks, a check carbon with writing on it, and an automobile insurance card with Barba's name on it. The two Ashby checks had been signed. One was made out to Claudia Gutierrez and the other was made out to Jessica Lofgreen.

Officer Kolombatovic also found stolen checks in Aguilera's purse, including two of Ashby's stolen checks, which had been made out payable to Barba and Aguilera, respectively. Kolombatovic found a third Ashby check in the van's ashtray, made payable to Sheri Richter.

Officer Bonilla transported Barba to the police station for an interview. Barba told Bonilla that he knew that the check he was attempting to cash was stolen, and admitted that he had obtained the check from Lofgreen. Barba also admitted that he and his companions had cashed two other of Ashby's stolen checks in the day or two prior to this incident. Barba informed Bonilla that Lofgreen had written out the check just before Barba walked into The Check Cashing Place to cash it.

Officer Kolombatovic interviewed Lofgreen, who told him that she had received the checks from someone named "Jeff." She explained that she had been walking with Jeff a few nights earlier and they came across Ashby's vehicle. According to Lofgreen, Jeff reached into the vehicle and took some items out of it. She ran away because she was scared. However, later that day she ran into Jeff again and mentioned that she was having financial difficulties. Jeff then told Lofgreen that he had taken checks from the vehicle and gave her one of the checkbooks. Lofgreen later met up with Barba and Aguilera and they began trying to cash the checks. Lofgreen admitted that she had written out the checks, and that she had signed the signature lines on many of them.

## B. *Procedural background*

The People filed a complaint charging Barba and Lofgreen with the unlawful use of personal identifying information (§ 530.5, subd. (a); count 1);

forgery by possessing completed paper (§ 475, subd. (c); count 2); and receiving stolen property (§ 496, subd. (a); count 3). The complaint also charged Barba with burglary (§ 459; count 4), and charged Lofgreen with forgery of checks (§ 470, subd. (d); count 5).

On May 9, 2011, Judge Herbert J. Exarhos held a preliminary hearing. At that time the court permitted the People to amend the complaint to add a sixth count against Barba for burglary (§ 459). At the conclusion of the preliminary hearing, the court dismissed count 1 for insufficient evidence as to both Barba and Lofgreen.

A few weeks later, the People filed a six-count information in which the People realleged a violation of section 530.5, subdivision (a) as count 1 against both defendants.[4] The People subsequently amended the charging document to add a third defendant, Claudia Lizethe Aguilera, to the case.

Lofgreen's defense attorney filed a motion to dismiss count 1 of the information, and Barba's counsel moved to join in Lofgreen's motion.

Judge Bubis held a hearing on the motion to dismiss on July 7, 2011. At the conclusion of the hearing, the court granted the joint motion to dismiss count 1.

The People filed a timely notice of appeal pursuant to section 1238, subdivision (a)(1).

## III.

## DISCUSSION

### A. *The trial court erred in interpreting section 530.5, subdivision (a)*

The trial court dismissed count 1 based on the court's conclusion that section 530.5 was intended to be used not when someone "forges a check but when someone represents themselves to be another person such as when they were cashing a check."[5] The court determined that "presenting a forged check to be cashed when it's made out in the name of the actual person who is

---

[4] A renumbering of original counts 4 through 6 occurred with the filing of the information. Those counts are not at issue in this appeal.

[5] The trial court reasoned, "[I]t appears that the [section] 530 statute is an identity theft type statute. I think that's the thrust of the statute. And it doesn't appear to me that when someone forges a check—it doesn't appear that the statute is to be used when someone forges a check but when someone represents themselves to be another person such as when they were cashing a check."

attempting to cash a check is not a violation of [section] 530.5." In reaching this conclusion, the trial court read the element of "personation"[6] into the statute, and proceeded to find that because defendants had not attempted to portray themselves as someone else during this forged check cashing scheme, there was no violation of section 530.5. The People argue that the trial court's interpretation of the statute to require some form of "personation" is erroneous, and that the court's dismissal of count 1 on the ground that there was no evidence of personation was thus improper.

Because the superior court's dismissal of count 1 as to both defendants was based on undisputed facts, the court's determination that there was no violation of section 530.5 constitutes a legal conclusion, which is subject to independent review on appeal. (*See People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].)

■ " ' " '[The court's] role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.]' " ' [Citation.]" (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 741 [25 Cal.Rptr.3d 879] (*Hagedorn*).) " ' "[W]e begin with the words of a statute and give these words their ordinary meaning." [Citation.] "If the statutory language is clear and unambiguous, then we need go no further." [Citation.] If, however, the language supports more than one reasonable construction, we may consider "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." [Citation.] Using these extrinsic aids, we "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]" (*Id.* at p. 741.)

Section 530.5, subdivision (a) provides: "Every person who willfully obtains personal identifying information, as defined in subdivision (b) of Section 530.55, of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public offense, and upon conviction therefor, shall be punished by a fine,

---

[6] To "personate" means "to assume without authority and with fraudulent intent (some character or capacity)." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 924.) Although "personate" and "impersonate" are synonymous (see *id.* at p. 624) and each has been used by the Legislature in various statutory provisions (see, e.g., § 528.5. [prohibiting impersonation through or on a Web site]; § 530 [prohibiting false personation of another in order to receive money or property]), for purposes of consistency, we will use the terms "personate" or "personation" to refer to the act of portraying oneself to be someone else.

by imprisonment in a county jail not to exceed one year, or by both a fine and imprisonment, or by imprisonment pursuant to subdivision (h) of Section 1170."

In turn, section 530.55, subdivision (b) defines " 'personal identifying information' " as: "any name, address, telephone number, health insurance number, taxpayer identification number, school identification number, state or federal driver's license, or identification number, social security number, place of employment, employee identification number, professional or occupational number, mother's maiden name, demand deposit account number, savings account number, checking account number, PIN (personal identification number) or password, alien registration number, government passport number, date of birth, unique biometric data including fingerprint, facial scan identifiers, voiceprint, retina or iris image, or other unique physical representation, unique electronic data including information identification number assigned to the person, address or routing code, telecommunication identifying information or access device, information contained in a birth or death certificate, or credit card number of an individual person, or an equivalent form of identification."[7]

■   The elements of the crime defined by the language of the statute may be summarized as follows: (1) that the person willfully obtain personal identifying information belonging to someone else; (2) that the person use that information for any unlawful purpose; and (3) that the person who uses the personal identifying information do so without the consent of the person whose personal identifying information is being used. (See *In re Rolando S.* (2011) 197 Cal.App.4th 936, 940 [129 Cal.Rptr.3d 49]; see also *People v. Tillotson* (2007) 157 Cal.App.4th 517, 533 [69 Cal.Rptr.3d 42].)[8]

Giving the words of the statute their ordinary meaning, we note that nothing in section 530.5, subdivision (a) suggests a requirement that the defendant have falsely personated another person. Neither the words "identity

---

[7] The statute provides that a "person" is "a natural person, living or deceased, firm, association, organization, partnership, business trust, company, corporation, limited liability company, or public entity, or any other legal entity." (§ 530.55, subd. (a).)

[8] In addition, CALCRIM No. 2040, the CALCRIM instruction that pertains to this offense, sets forth the elements of the offense in section 530.5, subdivision (a), as follows:

"The defendant is charged [in Count _____] with the unauthorized use of someone else's personal identifying information [in violation of Penal Code section 530.5[, subdivision] (a)].

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant willfully obtained someone else's personal identifying information;

"2. The defendant willfully used that information for an unlawful purpose;

"AND

"3. The defendant used the information without the consent of the person whose identifying information (he/she) was using."

theft" nor any similar phrase appears in the statute. Rather, the terms of the statute prohibit a much wider range of conduct than the personation of another using his or her personal identifying information. The statutory language is clear and unambiguous and contains no requirement that the defendant have held himself out as someone else. The plain language of the statute thus does not support the trial court's interpretation of the statute as requiring that defendant have personated another. Rather, the statute clearly provides that anyone who *obtains* personal identifying information and *uses* it for an unlawful purpose without that person's consent has violated section 530.5, subdivision (a).

Although the language of the statute is clear, it is noteworthy that the legislative history of section 530.5, subdivision (a) supports our interpretation of the statute. From 1997 to 2006, section 530.5, subdivision (a) prohibited the willful obtaining and use of another person's identifying information "in the name of the other person." However, this language was removed from subdivision (a) as of 2006.[9] (Stats. 2006, ch. 522, § 2, p. 3793.)

■ " 'As a general rule, in construing statutes, "[w]e presume the Legislature intends to change the meaning of a law when it alters the statutory language [citation], as for example when it deletes express provisions of the prior version [citation]." ' [Citation.]" (*Quarry v. Doe I* (2012) 53 Cal.4th 945, 984 [139 Cal.Rptr.3d 3, 272 P.3d 977]; see *People v. Soto* (2011) 51 Cal.4th 229, 245 [119 Cal.Rptr.3d 775, 245 P.3d 410] [" 'The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision.' [Citation.]"].) By removing the phrase "in the name of the other person" from the statute, the Legislature indicated its intention not to require that a defendant have portrayed himself or herself as the person whose information was used in order for that defendant to have violated section 530.5, subdivision (a).

Despite the unambiguous language of the statute and the legislative history, defendants argue that section 530.5, subdivision (a) was not intended to cover a situation in which a defendant attempts to cash a stolen check by making the check payable to himself or herself, without personating someone else. Specifically, defendants contend that if such conduct "constituted identity theft [(i.e., a violation of section 530.5, subdivision (a))], then every forgery would encompass identity theft," and such an interpretation "would render the forgery statutes meaningless." In making this argument, defendants

---

[9] Prior to 2006, the relevant language of former section 530.5, subdivision (a) provided: "and *uses* that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, or medical information *in the name of the other person* without the consent of that person . . . ." (See Stats. 2006, ch. 522, § 2, p. 3793, italics added.)

overstate the issue and fail to acknowledge that although there may be some overlap in the conduct that section 530.5, subdivision (a) and the forgery statute prohibit, the statutes are concerned with remedying two different wrongs, as the People note.

First, defendants' suggestion that under the interpretation of section 530.5, subdivision (a) that we adopt, "every forgery [will] constitute[] identity theft," is simply not true. Section 475, which defines the offense of forgery, provides:

"(a) Every person who possesses or receives, with the intent to pass or facilitate the passage or utterance of any forged, altered, or counterfeit items, or completed items contained in subdivision (d) of Section 470 with intent to defraud, knowing the same to be forged, altered, or counterfeit, is guilty of forgery.

"(b) Every person who possesses any blank or unfinished check, note, bank bill, money order, or traveler's check, whether real or fictitious, with the intention of completing the same or the intention of facilitating the completion of the same, in order to defraud any person, is guilty of forgery.

"(c) Every person who possesses any completed check, money order, traveler's check, warrant or county order, whether real or fictitious, with the intent to utter or pass or facilitate the utterance or passage of the same, in order to defraud any person, is guilty of forgery."

█ Notably, the offense of forgery may be committed by one who possesses either a real or *fictitious* check. Someone who commits the offense of forgery by using a fake check or similar instrument in which no real person or legal entity is identified would not be guilty of violating section 530.5, subdivision (a). Thus, not every forgery will constitute a violation of section 530.5, subdivision (a).

Even if there are many instances in which a person who forges a stolen check may also be convicted of violating section 530.5, subdivision (a), it is not uncommon in criminal law for a person to be convicted of violating multiple statutes based on a single act or course of conduct. (See *People v. Mesa* (2012) 54 Cal.4th 191, 195 [142 Cal.Rptr.3d 2, 277 P.3d 743] [discussing history of § 654, and longstanding interpretation of that section as permitting " 'multiple convictions arising out of a single act or omission, but [barring] multiple punishment for those convictions.' [Citations.]"].) Thus, the mere fact that a person who forges and attempts to cash a real check may ultimately be found guilty of violating two different criminal statutes is not a reason to interpret section 530.5, subdivision (a) as requiring proof of an element that the Legislature did not include in the language of the statute.

Further, the forgery statutes and section 530.5, subdivision (a) are intended to protect different potential victims, as the facts of this case illustrate. The forgery statutes attempt to protect the *recipient* of the forged document from being defrauded. In this case, that would be any of the check cashing businesses at which defendants cashed the stolen and forged checks. Section 530.5, subdivision (a), on the other hand, is intended to protect the person or entity, such as Ashby Remodeling & Services, whose personal information has been misappropriated and used for an unlawful purpose. (See *People v. Valenzuela* (2012) 205 Cal.App.4th 800, 807–808 [141 Cal.Rptr.3d 34] (*Valenzuela*).) In fact, the *Valenzuela* court quoted the Senate Committee on Public Safety regarding the fact that section 530.5 addresses disruptions caused in victims' lives when their personal identifying information is used, even if those victims may not have been financially harmed as a result of a defendant's conduct: " '[T]he crimes of identity theft, and complementary statutory provisions, were created because the harm suffered by identity theft victims went well beyond the actual property obtained through the misuse of the person's identity. *Identity theft victims' lives are often severely disrupted.* For example, where a thief used the victim's identity to buy a coat on credit, the victim may not be liable for the actual cost of the coat. However, if the victim was initially unaware of the illicit transaction, the damage to the person's credit may be very difficult to repair. The perpetrator could commit other crimes by using the victim's identity, causing great harm to the victim. Thus, identity theft in the electronic age is an essentially unique crime, not simply a form of grand theft. [¶] . . .' [Citation.]" (*Valenzuela, supra*, at p. 808, italics added.)

Some of the confusion about exactly what conduct section 530.5, subdivision (a) prohibits may be attributable to the fact that the statute is often referred to as an "identify theft" statute. (See, e.g., *Valenzuela, supra*, 205 Cal.App.4th at p. 804; *Hagedorn, supra*, 127 Cal.App.4th at p. 743.) However, as we have explained, the statute itself does not use that phrase, nor does it require that a defendant portray himself as someone else. Although it may have been expedient for courts and members of the Legislature to refer to this statute using the shorthand expression "identity theft," and although many people have a generalized belief that "identity theft" involves personating someone else (i.e., someone pretending to be someone else in order to defraud a third party), the statute does not, in fact, require that a defendant have personated another in using another individual's personal identifying information in order to be convicted under its terms. "[T]he fact that the bill's author and supporters may have used a shorthand term to describe someone who makes unauthorized use of personal identifying information of another, or '[t]he fact that the Legislature may not have considered every factual permutation of [identity theft], including [conduct which purportedly causes

no financial harm or loss], does not mean the Legislature did not intend for the statute to reach that conduct.' [Citation.]" (*Hagedorn, supra,* at pp. 743–744.)

■ Subdivision (a) of section 530.5 is broader in scope than simply prohibiting the false personation of another, and the use of the shorthand term "identity theft" to describe the offense made punishable in section 530.5 does not provide a reason to read into the statute an additional element that cannot be found by referring to the language of the statute.

B. *Under the proper interpretation of section 530.5, subdivision (a), the preliminary hearing provided probable cause to hold defendants to answer to the charge in count 1*

Applying section 530.5, subdivision (a) as we construe it, we conclude that there was probable cause to hold defendants to answer to the charge in count 1.

At the conclusion of the preliminary hearing, the magistrate dismissed count 1 for insufficient evidence, based on an erroneous interpretation of section 530.5, subdivision (a). The magistrate made no factual findings with respect to this charge. After the People realleged the section 530.5, subdivision (a) charge in the information, the trial court dismissed the charge a second time based on the same erroneous interpretation of the statute.

■ "[W]hen a district attorney files an information in the superior court, containing an offense not included in the commitment order signed by the magistrate who conducted the preliminary examination on the initial complaint, the court must uphold the information if the evidence adduced at the preliminary hearing is sufficient to support the new or additional charge [citation]." (*People v. McKee* (1968) 267 Cal.App.2d 509, 514 [73 Cal.Rptr. 112].) "In short, under Penal Code section 739 the district attorney is not bound by the view of the committing magistrate; he is free to file an information charging the highest offense which any reasonable construction of the evidence adduced at the preliminary hearing admits [citation]. Thus, when section 739 and Penal Code section 995 are read conjointly, it follows that the superior court is likewise not bound by the view of the committing magistrate; it too should uphold the information as to any offense charged in the information of which any reasonable construction of the evidence adduced at the preliminary hearing admits. In other words, if the defendant moves to dismiss the information under these circumstances, the question of his guilt or innocence is not before the court nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. On the contrary, the court should decide from the evidence adduced at the preliminary hearing, without attempting to reconcile conflicts or judge the credibility

of the witnesses, whether there is reasonable or probable cause to believe the defendant guilty of the offense charged. And, there is sufficient evidence to require the superior court to deny defendant's motion if it raises a clear and distinct inference of the existence of the essential elements of the crime charged [citation]." (*McKee, supra*, at pp. 514–515, fns. omitted.)

Although the trial court and this court would be bound by any express factual findings made by the magistrate, if the magistrate "renders no findings, the reviewing court may find the dismissal erroneous as a matter of law whenever the evidence provides a rational basis for believing that the defendant is guilty of the offense." (*People v. Slaughter* (1984) 35 Cal.3d 629, 633 [200 Cal.Rptr. 448, 677 P.2d 854].)

The evidence adduced at the preliminary hearing leads to the inescapable conclusion that defendants both willfully obtained and used the personal identifying information of Ashby Remodeling & Services without the consent of Ashby or anyone else authorized to consent to the use of that information. The trial court thus erred when it dismissed the count charging defendants with violating section 530.5, subdivision (a).

■ First, there is clearly evidence that defendants willfully obtained another party's personal identifying information. Personal identifying information includes any name, address, telephone number, checking account and unique electronic data for addresses or routing codes, and a "person" for purposes of the statute may be a company such as Ashby Remodeling & Services. (See § 530.55, subd. (a).) The checks that Lofgreen and Barba possessed contained this information pertaining to Ashby Remodeling & Services. Further, defendants admitted that they intentionally gained possession of these checks.

There was also evidence presented at the preliminary hearing that provides a rational basis for believing that defendants used the company's personal identifying information for an unlawful purpose. Specifically, the evidence demonstrated that through their check cashing scheme, Barba and Lofgreen used the personal identifying information on the Ashby Remodeling & Services checks to obtain money from either the accounts of Ashby Remodeling & Services, or the accounts of the businesses where defendants cashed the stolen checks. Although defendants argue that they did not actually "use" the personal identifying information that was printed on the stolen checks, there can be no doubt that by submitting the stolen checks for cashing, defendants were relying on the personal identifying information provided on those checks to obtain money to which they were not entitled. The evidence was therefore sufficient to show that defendants used Ashby Remodeling & Services's personal identifying information for an unlawful purpose.

Finally, the evidence presented at the preliminary hearing was sufficient to demonstrate that defendants used the personal identifying information of Ashby Remodeling & Services for an unlawful purpose *without consent*. Ashby, the owner of Ashby Remodeling & Services, said that the checks had been stolen from his vehicle, that he did not know any of the defendants, and that he had not given any of the defendants permission to possess or cash the Ashby Remodeling & Services checks.

■ The People presented sufficient evidence at the preliminary hearing to establish probable cause to hold defendants to answer to the charge that they willfully obtained personal identifying information belonging to Ashby Remodeling & Services, and that they used that information for the unlawful purpose of cashing the stolen checks without Ashby's consent. The trial court thus erred in dismissing count one of the information in which defendants were charged with violating section 530.5, subdivision (a).

## IV.

## DISPOSITION

The trial court's order dismissing count 1, for violating section 530.5, subdivision (a), is reversed as to defendants Barba and Lofgreen.

McConnell, P. J., and Benke, J., concurred.

Respondents' petitions for review by the Supreme Court were denied February 20, 2013, S207311.