Filed 10/22/14  P. v. Cox CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Appellant,

v.

JASON WAYNE COX,

    Defendant and Respondent.

E060288

(Super.Ct.No. FWV1202312)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Reversed with directions.

Michael Ramos, District Attorney, and Brent J. Schultze, Deputy District Attorney for Plaintiff and Appellant.

Law Offices of Michael A. Scafiddi, Megan A. Scafiddi and Richard V. Myers for Defendant and Respondent.

# I

## INTRODUCTION

Defendant Jason Wayne Cox was accused of driving a truck that struck and killed a bicyclist. The People appeal from the trial court's order setting aside count 1 of the information, charging defendant with vehicular manslaughter with gross negligence. (Pen. Code, §§ 192, subd. (c)(1), 995, 1238, subd. (a)(1); *People v. Alice* (2007) 41 Cal.4th 668, 680.)[1]

We conclude there are three aspects of defendant's conduct which support a charge of gross negligence: 1) committing multiple Vehicle Code violations while driving; 2) not stopping immediately after hitting the cyclist; and 3) leaving the scene of the accident and not reporting it. In summary, the facts, or reasonable inferences, offered at the preliminary hearing are as follows. Defendant was driving home about 6:30 p.m. in a company truck. He had gotten off his construction job about three hours before at 3:30 p.m. He had a history of Vehicle Code violations from 2001 to 2006 including a DUI in 2005. Defendant was driving west on Foothill Boulevard in Rancho Cucamonga. It was still daylight because sunset was an hour later. The number two lane was 25 feet wide and included a wide unmarked bike lane.

Two commercial video cameras showed the bicyclist and then a truck traveling west on Foothill. The cameras did not record the truck overtaking or hitting the bicyclist.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

A witness waiting for the red light to change at Ramona Avenue watched the truck make a right turn, north on Ramona, and then spotted the cyclist on the ground. The truck did not stop. The accident investigator concluded that the driver had committed five Vehicle Code violations, all of which contributed to the accident. Additionally, by not stopping immediately, the driver may have dragged the bicyclist, exacerbating his injuries.

Defendant did not report the accident. He did, however, call his sister an hour later and seemed distressed. He lied to his brother about where he was that night or the rest of the week. He told his father he was in trouble. He returned the company truck to the work yard where it remained until weeks later the police got an anonymous tip that defendant had been involved in a hit-and-run. When the police finally contacted defendant at his home, he was unsurprised.

We agree with the People that, based on the legitimate inferences that may be drawn by the evidence, sufficient evidence supports charging defendant with gross vehicular manslaughter. (§ 192, subd. (c)(1).) We reverse the trial court's order.

II

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Preliminary Hearing*

The accident which killed Michael Vega occurred at around 6:35 p.m. on August 28, 2012, in Rancho Cucamonga near the intersection of Foothill Boulevard and Ramona Avenue and close to where defendant lived. The speed limit on Foothill was 45 miles per hour. The number one lane is 12 feet wide. The number two lane is 25.3 feet wide. The

3

sun was still shining brightly.[2]

Kristy Fenton testified that she was taking her son to karate lessons and driving southbound on Ramona. She had stopped at a red light while waiting to cross Foothill. Because she and her son were playing a vehicle-spotting game, she was scanning traffic. While looking to her left, Fenton observed a white truck with ladder racks make a right turn, north from Foothill to Ramona. Then she saw a man laying on the ground on Foothill, east of Ramona. She estimated the truck was traveling about 25 to 30 miles per hour. Fenton did not recall telling a deputy sheriff she had heard a collision. In court, Fenton identified defendant as the driver. A video from a nearby business showed a bicyclist traveling west on Foothill, followed by a white truck. There is no video footage of the truck passing or hitting the bicyclist.

Fenton parked her car and went to help Vega. The victim was laying on his back in the gutter, near the curb, in the unmarked bike lane. (Veh. Code, § 21202.) Vega was wearing a helmet but no shoes and ear buds were tangled in the strap of his helmet. There was road rash on his legs, chest, and back; his shirt was torn; and he had a bloody mouth. Vega was making rocking movements. Fenton called 911 and tried to calm Vega who grabbed her hand and made eye contact with her but kept rocking. While waiting for the paramedics, Fenton held Vega's head until his movements stilled and pink foam came from his mouth.

---

[2] Official records report that sunset on August 28, 2012, occurred at 7:25 p.m.

4

A diagram prepared by a deputy sheriff depicted several locations from east to west along Foothill:  a bicycle tire friction mark; a gouge; a scuff of fabric and tissue; a bike helmet; a pool of blood; two shoes; a bicycle; and some headphones.  The friction mark was 32 feet long.  The deputy's opinion was that the friction mark was caused when the bicycle was hit by a faster, heavier object.  West of the friction mark, the gouge was caused by the bicycle pedal striking the asphalt.  The fiber matched Vega's clothes.  The bike helmet was next to blood pooling in the gutter and spattered on the curb.  The shoes and the bicycle were located farthest to the west.

Because the bicycle's rear wheel was crushed and the flat spot on the tire was consistent with the friction mark, the deputy's opinion was the bicyclist was hit from the rear and was pinned and pushed by a vehicle traveling west.  Depending on the speed of the vehicle, it would take from half a second to two seconds to travel from the point of impact to the pool of blood.  The distance from impact to the pool of blood was 70.3 feet.

When the accident investigator arrived at the scene, Vega was on the ground and unresponsive.  He was bleeding from the mouth and leg and there was severe road rash on his back, chest, and limbs.  His injuries showed he had been dragged.  There were no vehicle skid marks indicating braking.

Defendant's father, sister, and brother testified they remembered very little about what defendant was doing on August 28, 2012, or how he behaved in the days and weeks afterwards.  However, a detective testified that defendant's brother told him defendant did not come home that night or the rest of the week, claiming he was working in Big

5

Bear. Another detective testified that defendant's sister said defendant had called her between 7:00 and 8:00 p.m. on August 28, 2012, and sounded nervous, causing her to be concerned. Defendant's father told the second detective that defendant had said he was in trouble.

About two weeks after the accident, an anonymous caller reported that defendant had been involved in a hit-and-run accident. The deputy sheriffs went to defendant's residence on September 12, 2012, and he appeared drunk. The deputies informed defendant they were investigating a collision and he said his work truck was at the storage yard. Defendant did not express any surprise about being contacted by the deputies. There was no record of defendant having called 911 on August 28, 2012.

Defendant worked for Peterson Pipeline and his usual working hours were 7:00 a.m. to 3:30 p.m. The truck defendant was driving was owned by Peterson Pipeline and was assigned to defendant. Defendant was permitted to drive the truck home at night. The truck was parked in the company yard for about two weeks after the accident before the deputies removed it. During that time, defendant drove his personal truck, which had recently been painted. Peterson testified that the truck in the videos resembled the truck assigned to defendant. Peterson's only active construction job at that time was in Chino, not in Big Bear.

The work truck was a 2002 Chevrolet 2500 HD, double cab. A piece of plastic was embedded in the front bumper, which also had a scuff mark with a paint transfer matching the bicycle. The truck's rear passenger side wheel was scraped on the upper

6

left edge. The undercarriage of the truck showed fresh fingerprints. Based on all the physical evidence, the investigator's opinion was that Vega was pinned upright by the truck for about 32 feet before Vega and the bicycle fell beneath the undercarriage and onto the road. The failure to stop after first hitting Vega created a high risk of death or great bodily injury.

The deputies concluded that defendant had committed multiple Vehicle Code violations: traveling outside the lane (Veh. Code, § 21658, subd. (a)); following too closely (Veh. Code, § 21703); unsafe lane change (Veh. Code, § 22107); failure to pass safely (Veh. Code, § 21750); and traveling at an unsafe speed. (Veh. Code, § 22350.) The deputies believed the white truck was following too closely when making a right turn on Ramona, hit the bicyclist, and failed to stop, causing the accident. On cross-examination, the investigator agreed that the tire friction mark began within the distance provided for the lefthand turn pocket. and was about nine feet from the curb, and that the driver was driving toward the setting sun. The investigator could not establish the truck's speed but the investigator's observations were consistent with a driver not seeing the bicyclist in front of him.

Defendant had a history of Vehicle Code violations: running a red light in 2001 (Veh. Code, § 21453, subd. (a)); making an illegal turn against a red light in 2002 (Veh. Code, § 21453, subd. (b)); violating the basic speed law and exceeding the speed limit in 2002 and 2003 (Veh. Code, §§ 22349, 22350; driving under the influence in 2005 (Veh.

7

Code, § 23152); and driving with a suspended license in 2006. (Veh. Code, § 14601.2, subd. (a).)

At the end of the preliminary hearing, the magistrate held defendant to answer on count 2, leaving the scene of a collision (Veh. Code, § 20001, subd. (a)) and the great bodily injury enhancement. (§ 12020.7.) The court also found there was no evidence of gross negligence and therefore defendant was held to answer only for vehicular manslaughter without gross negligence. (§ 192, subd. (c)(2).)

*B. The Information*

The information, which was filed after the preliminary hearing, charged defendant with count 1—driving a vehicle with gross negligence, including fleeing the scene of a crime (Pen. Code, § 192, subd. (c)(1), and Veh. Code, § 20001, subd. (c))—and count 2—leaving the scene of a collision, including personally inflicting great bodily injury. (Veh. Code, § 20001, subd. (a), and Pen. Code, § 12022.7, subd. (a).) Both counts were subject to a special allegation that they were serious or violent felonies. (Pen. Code, § 1170, subd. (h)(3).)

*C. Section 995 Motion*

Defendant filed a motion to set aside the information under section 995, challenging count 1 and the great bodily injury allegation on count 2. Defendant argued the magistrate had made binding factual findings about gross negligence and, in the alternative, there was no evidence of gross negligence and insufficient evidence of the great bodily injury enhancement.

8

In opposition, the People argued the magistrate did not make express factual findings and only reached legal conclusions.  Additionally, there was sufficient evidence of gross negligence and great bodily injury.

The trial court agreed the magistrate had not made binding factual findings but then found there was insufficient evidence of gross negligence.  The trial court granted the motion as to count 1 and denied the motion as to the great bodily injury enhancement on count 2.

III

STANDARDS OF REVIEW

In *People v. Jones* (1998) 17 Cal.4th 279, 301, the California Supreme Court explained the standard of appellate review of a trial court's ruling on a section 995 motion, quoting *People v. Laiwa* (1983) 34 Cal.3d 711:  "'[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate.  [Citation.]  On review by appeal . . . the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer.' (*Id.* at p. 718.)"  The reviewing court is bound by the magistrate's express findings of fact if supported by substantial evidence but not the magistrate's legal conclusions if erroneous.  (*People v. Slaughter* (1984) 35 Cal.3d 629, 633, 639-640.)

9

"[T]he showing required at a preliminary hearing is exceedingly low" unless "there is a total absence of evidence." (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846.) Furthermore, "[a]n information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. [Citations.] [¶] A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, the court will not inquire into its sufficiency. [Citations.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.)

Finally, "'[W]hen a district attorney files an information in the superior court, containing an offense not included in the commitment order signed by the magistrate who conducted the preliminary examination on the initial complaint, the court must uphold the information if the evidence adduced at the preliminary hearing is sufficient to support the new or additional charge [citation].' (*People v. McKee* (1968) 267 Cal.App.2d 509, 514.)" (*People v. Barba* (2012) 211 Cal.App.4th 214, 227; § 739.)

IV

VEHICULAR MANSLAUGHTER WITH GROSS NEGLIGENCE

The People contend there is sufficient evidence to charge defendant with gross vehicular manslaughter in violation of section 192, subdivision (c)(1). Section 192, subdivision (c)(1), defines felony vehicular manslaughter as "driving a vehicle in the

commission of an unlawful act, not amounting to felony, and with gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence."

The meaning of gross negligence has been explained many times. *People v. Bennett* (1991) 54 Cal.3d 1032, 1036, asserts: "Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] 'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I don't care what happens."' [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. [Citation.]" Gross negligence does not include "inattention, mistaken judgment, or misadventure . . . ." (*Id.* at p. 1037, fn. 3.) Gross negligence involves aggravated, reckless, or flagrant disregard for human life, or indifference to consequences of one's conduct. (*People v. Thompson* (2000) 79 Cal.App.4th 40, 54.)

Put another way, gross negligence occurs when the defendant's acts are such a departure from what would be the conduct of "'"'an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.'"' [Citations.]" (*People v. Alonzo* (1993) 13 Cal.App.4th 535, 540.) "'The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen.' [Citations.]" (*People v. Clem* (2000) 78 Cal.App.4th 346, 352, quoting *People v. Penny*

11

(1955) 44 Cal.2d 861, 880; see also *People v. Odom* (1991) 226 Cal.App.3d 1028, 1032.)

"[G]ross negligence required to convict a defendant of gross vehicular manslaughter . . . may be based on the overall circumstances surrounding the fatality." (*People v. Bennett, supra*, 54 Cal.3d at p. 1040.)

A number of cases have addressed grossly negligent vehicular manslaughter. In *People v. Leitgeb* (1947) 77 Cal.App.2d 764, 769, [cited with approval in *People v. Bennett, supra,* 54 Cal.3d at p. 1039], in which the jury found gross negligence: "[D]efendant was driving his car at 40 miles an hour, veered across a corner of, and struck decedent in, the safety zone. According to his own testimony, he did not see decedent until the instant he struck him. There was no evidence whatever as to any circumstance that would have made it necessary for defendant to invade the safety zone, nor was there any evidence of any obstruction in the street, or other condition which would have prevented defendant's seeing decedent standing in the safety zone. The corner was sufficiently lighted for other witnesses to see objects in the street."

The *Leitgeb* appellate court agreed with the jury: "Not only was the conclusion of the jury a reasonable one, but in our opinion it was the more reasonable. There is not the least doubt in our minds that upon the state of facts which formed the basis of the verdict, appellant was guilty of gross negligence. Even if he had been driving at 25 miles an hour, as he claimed, our conclusion would be the same. It appears from his own testimony that he was driving past the safety zone at a speed which placed all the responsibility for avoiding injury upon persons who might be occupying the street at that

12

point.  He was not slowing down, nor did he have control of the car that would have enabled him to stop quickly if it should become necessary to do so in order to avoid an accident.  He should have been especially cautious in approaching the safety zone and should have anticipated the presence of persons waiting for a car.  He did not do this, but took a chance that no pedestrian would get in his way.  His failure to see the pedestrian was unexplained.  There are, of course, conditions in which it is difficult for motorists to see pedestrians on the streets, but the conditions here were not shown to have been unusual, and the only reasonable explanation of defendant's failure to see the decedent is that he was not exercising even the slightest degree of care."  (*People v. Leitgeb, supra,* 77 Cal.App.2d at pp. 769-770.)

Following *Leitgeb* was a case involving a driver who hit a group of 10 people gathered in a crosswalk responding to the victim of an earlier accident:  "It is unnecessary to review the evidence for the purpose of pointing out wherein it was sufficient to justify a finding that defendant was not driving in the exercise of ordinary care or in the fulfillment of her duties as defined in the instructions.  It is not surprising that the jury determined from the evidence that in causing the death of three people and injury to seven others, defendant was not driving with the care usually exercised by persons of ordinary prudence and caution.  There was nothing to obstruct her vision or to excuse her failure to see the crowd in the street ahead of her.  It was an inescapable conclusion that she failed to see them in time to avoid them only because she was paying little or no

13

attention to what lay ahead of her." (*People v. Wilson* (1947) 78 Cal.App.2d 108, 118-119.)

Another case citing *Leitgeb* held: "And where a driver did not see his victim until the instant of impact or not at all, he is guilty of gross negligence or of an entire indifference to those who were using the street or highway simultaneously with him. (*People v. Leitgeb*, 77 Cal.App.2d 764, 769.)

". . . There is no fact proved or theory proposed in the record of the instant cause that could reasonably warrant an inference of appellant's freedom from gross negligence. He drove his coupe in the night on a residence and business street at a speed greater than was reasonable and prudent, to wit, in excess of 50 miles an hour. By reason of his having thereby killed a person without malice and while committing such lawless act he is guilty of involuntary manslaughter under section 192 of the Penal Code." (*People v. Flores* (1947) 83 Cal.App.2d 11, 14.)

Inattention was also held to constitute gross negligence in *People v. Pfeffer* (1964) 224 Cal.App.2d 578, 581: "The course of action followed by the defendant at the time in question demonstrates a complete failure on his part to exercise any care and shows a conscious indifference to the consequences which might follow going through a red signal light at high speed—he obviously had no control over his car and seemingly cared nothing at all for the right of way of others upon the road at the time—he exercised no vigilance and seemingly did not anticipate that there might well be automobiles with passengers therein traveling on Willow Street across Lakewood with the green signal

14

lights. If there was anything present to obstruct the view of appellant, or any excuse at all for that matter, we have not heard of it from the appellant or any witness who observed what occurred. Driving at excessive speed, taking chances at an intersection, inattention to driving or similar acts, coupled with other circumstances as here present constitutes gross negligence."

CALCRIM No. 592 tracks the statute and case law concerning gross vehicular manslaughter. The People must prove that, while driving a vehicle defendant committed with gross negligence a misdemeanor or infraction or otherwise lawful act that might cause death and the defendant's grossly negligent conduct caused the death of another person:

"*Gross negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when:

"1 He or she acts in a reckless way that creates a high risk of death or great bodily injury;

"AND

"2 A reasonable person would have known that acting in that way would create such a risk.

"In other words, a person acts with gross negligence when the way he or she acts is so different from how an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."

In its simplest phrasing, defendant's argument is that his conduct was ordinary negligence because there is no evidence he saw the bicyclist before he hit him or that defendant realized he had hit the bicyclist and continued without stopping. Although defendant's interpretation of the evidence may be plausible, another equally reasonable interpretation of the evidence is defendant was driving recklessly when he started to make his right turn from Foothill to Ramona and he disregarded the bicyclist on his right even though nothing obstructed his view.

This is not a situation in which a driver was fiddling with the radio, or even inexplicably inattentive, causing him or her to hit someone. In such a case, the driver reasonably could be expected to stop immediately and to render assistance and report the accident. Instead, this case involves a driver who demonstrated little regard for the safety of the victim, as shown by his conduct before and after the accident, as well as the evidence developed during the investigation.

The circumstances fit the criteria for gross negligence described above. The evidence showed that the right lane was twice as wide as the left lane on Foothill, providing enough room for a wide, unmarked bike lane next to the curb. It was still daylight and there were no obstructions to a driver's line of sight. The bicyclist was struck near the beginning of the place where it is likely the truck would have begun to turn right and the bicyclist was dragged some distance and dropped beside the curb. The testimony that there were no skid marks created a reasonable inference that defendant did not see the bicyclist before hitting him and made no effort to stop afterwards. Even if

16

defendant was not speeding, he committed numerous code violations: following too closely, making an unsafe lane change, and failing to pass safely. (Veh. Code, §§ 21703, 21750, and 22017.)

Based on the investigator's conclusions, a jury could reasonably infer defendant was driving adjacent to the unmarked bike lane, making him responsible for avoiding injury. The jury could find the driver should have been especially cautious and noticed the presence of a cyclist. Even if it was difficult to see a cyclist, the road conditions here were not unusual. A jury could find the only reasonable explanation for defendant's failure to see the decedent is that he was not exercising due care. It was a reasonable conclusion that defendant hit and dragged the victim because he was paying little or no attention to what lay ahead of him.

Other circumstances that have a bearing on a charge of gross negligence is that defendant did not stop and continued to drag the victim some distance. Additionally, he fled the scene and tried to cover up his involvement. His conduct after hitting the cyclist contributed to a finding of conscious indifference: "'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I don't care what happens."' (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)" (*People v. Bennett, supra,* 54 Cal.3d at p. 1036.)

Therefore, a jury could reasonably determine, based on the People's evidence, that defendant did not heed the bicyclist for reasons that exceeded "ordinary carelessness, inattention, or mistake in judgment" and constituted recklessness or conscious disregard.

17

Based on the totality of the circumstances surrounding the accident, the jury could reasonably conclude defendant was driving with indifference or conscious disregard for the consequences of his actions. (*Ibid.*) As a result, we conclude sufficient evidence could allow a rational trier of fact to find that defendant acted with gross negligence.

Defendant argues that the cases cited by the People all involved drivers engaging in much more egregious and reckless behavior than his actions in this case. Defendant asserts there is no evidence of grossly negligent conduct because no witness saw him speeding or driving recklessly and dangerously. However, we cannot say—as a matter of law—that a jury would be unreasonable in finding that defendant's actions constituted gross negligence. At this stage of the proceedings, when the showing required for a charge is "exceedingly low," there is not a "total absence of evidence." (*Salazar v. Superior Court, supra,* 83 Cal.App.4th at p. 846.) As a result, we conclude that, based on the legitimate inferences that may be drawn by the evidence, sufficient evidence supports charging defendant with vehicular manslaughter with gross negligence in violation of section 192, subdivision (c)(1). (*Rideout v. Superior Court, supra,* 67 Cal.2d at p. 474.)

V

DISPOSITION

We reverse the trial court's order setting aside count 1 of the information and

18

direct the court to reinstate the charge of gross vehicular manslaughter.  (§ 192, subd. (c)(1).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

KING
J.

19