Filed 3/29/16  P. v. Young CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>JOSEPH YOUNG,<br><br>        Defendant and Respondent. | A146206<br><br>(San Francisco County<br>Super. Ct. No. 223052) |

BY THE COURT:

It is ordered that the opinion filed herein on March 9, 2016, be modified as follows:

1.  On page 24, at the end of the first sentence in the first full paragraph, after the phrase "nothing remotely like this on the video", add the following footnote:

"Although the arguments and factual statements in the prosecution's papers opposing the section 995 motions are not evidence, they provide useful, but obviously not binding, points of reference for our own independent review of the evidence, which included intensive scrutiny of the video evidence.  That is, what did the prosecution (who, after all, realleged the murder count pursuant to section 739) believe was in the video excerpts and what was its import?"

2.  On page 26, in the first sentence of the first paragraph, delete the phrase "the agreed-upon" and replace it with "a".  It now reads: "to embark on a physical attack".

1

3.  On page 27, in the second full paragraph, delete the third full sentence beginning with "Because we give no credit" and replace it with the following sentences: "We have examined the entire record for inferences that support the murder charge. Because we give no credit to the prosecution's assertions that it was Young's gun, that he gave it to York, and that it was in Young's plain sight on the seventh floor, the evidence necessary to hold Young to answer for the murder charge depends in large part upon whether from Young's split second glance backward to the elevator and what immediately thereafter transpired, a reasonable inference can be drawn that defendant Young, with knowledge of York's criminal purpose, aided and abetted York's criminal assault of Beltran."

The petition for rehearing is denied.  This modification does not change the judgment.


Dated:_____                    _____

                                                                  Kline, P.J.

Filed 3/9/16  P. v. Young CA1/2 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> JOSEPH YOUNG, <br><br> Defendant and Respondent. | A146206 <br><br> (San Francisco County <br> Super. Ct. No. 223052) |

The People have appealed the trial court's order dismissing a charge of murder from a criminal information. The appeal raises two issues: Can a trial judge reconsider his own order denying a motion to dismiss an information pursuant to Penal Code section 995[1] when the judge acknowledges that when he initially ruled on the section 995 motion, he had not reviewed the video evidence that is essential to determining whether there is probable cause to hold a defendant to answer? And if such reconsideration is proper, did the trial judge then err in concluding (as did the magistrate who heard the preliminary hearing) that there was insufficient cause to hold the defendant to answer to the murder charge?

This matter first came to our attention as a petition for writ of mandate and application for stay filed by the People because defendant Joseph Young's trial on the remaining counts of the information was then scheduled for September 18, 2015. We issued a temporary stay of the trial to allow further briefing. After reviewing the briefing,

---

[1] All further undesignated statutory references are to the Penal Code.

we declined to resolve the matter by writ and denied the writ, but expedited the People's appeal of the identical issues, which had already been fully briefed.[2] We now hold that the trial judge did not err in reconsidering his own order denying the section 995 motion when it became apparent to him that he had made a ruling without actually having reviewed key evidence, and that he did not err when, upon reconsideration, he dismissed the murder charge against defendant Young.

**FACTUAL AND PROCEDURAL BACKGROUND**

This appeal arises out of an incident in the early morning hours of July 22, 2014, at the Henry Hotel in San Francisco. The San Francisco District Attorney filed a consolidated felony complaint charging defendant Joseph Young and codefendant Darius York (not a party to this appeal) with, among other charges, the murder and assault of Daniel Beltran, and the assault of Roger Alarcon. York was alleged to be the shooter.[3]

---

[2] The trial court's order dismissing the murder charge is an appealable order. (§ 1238, subd. (a)(1).) In our order denying the writ, we stated that the writ petition, and briefs received in connection with the writ petition, would be treated as the briefs on appeal, and that the record already submitted would be treated as the record on appeal, subject to any supplementation by the parties.

[3] The complete list of charges against Young at the time of the preliminary hearing were count 1, murder of Beltran; count 2, assault with force likely to cause great bodily injury against Beltran; count 3, assault with a deadly weapon, not a firearm, against Alarcon; count 4, assault with a semiautomatic firearm against Alarcon; count 5, assault with force likely to cause great bodily injury against Alarcon; count 8, maintenance of a place for selling or using a controlled substance; count 9, utilizing a fortified house in violation of Health and Safety Code section 11366.6; and count 11, attempted destroying evidence. As to the murder count, it was alleged that York (not Young) personally and intentionally discharged a firearm, to wit, a semiautomatic handgun, in violation of section 12022.53, subdivision (d). As to Young, it was alleged that he was armed with a firearm pursuant to section 12022, subdivision (a)(1). There was no evidence of any other firearm except the semiautomatic handgun that York was held to have discharged and which formed the basis for the original holding order of murder as to York.

The complaint also alleged enhancements and prior felony convictions that are not relevant here.

*Preliminary Hearing*

Judge Jerome Benson, a very experienced retired superior court judge, presided over the preliminary hearing, which lasted over the course of three days. The key piece of evidence at the preliminary hearing was video footage from the Henry Hotel taken on the morning of the incident, from around 4:30 a.m. until approximately 6:30 a.m. It was stipulated for purposes of the preliminary hearing that the video clips from the various surveillance cameras in and around the Henry Hotel were business records under Evidence Code section 1270, and that the court could view them without further foundation as evidence at the preliminary hearing. A substantial portion of the preliminary hearing consisted of showing the video evidence, which was primarily shown in connection with the testimony of Jon Kasper, a sergeant in the San Francisco Police Department, who is assigned to the homicide detail. Kasper was familiar with the lay-out of the Henry Hotel, and had reviewed and was familiar with the videos. Kasper identified the individuals in the video (including Young, York, the alleged victims and others), and from time to time provided a narration that was essential to understanding what was being shown on the screen. The video evidence was played painstakingly, with the same events sometimes shown from different angles taken by different cameras in and outside the hotel. The video clips were also shown in connection with the testimony of the People's other witness, Gary Owens, the Henry Hotel desk clerk the morning of the incident, who was an eyewitness to the events. Owens testified under a grant of immunity. We summarize the evidence that pertains to the murder charge that is at issue here.[4]

The video clips showed two individuals, identified as Beltran and Alarcon, who were attempting to gain entrance to a hotel room upstairs in the Henry Hotel. They first had to get inside the locked and gated inner lobby of the Henry Hotel. That is where the

[4] The section 995 motion also urged that Young not be held to answer on any of the other charges against him relating to alleged victim Beltran, as well as the two assault charges against alleged victim Alarcon. This part of the motion was denied, but it is not before us on the People's appeal. We consider only the murder charge.

3

trouble started. The Henry Hotel was frequently used for illegal drug transactions, and it was hotel policy that anyone seeking entrance to the hotel between the hours of 8:00 p.m. and 9:00 a.m. had to pay $10 and show identification. Owens was the desk clerk at the Henry Hotel on the morning in question, and he was sitting in the desk clerk's office when the events started to unfold. When Owens told Beltran and Alarcon that each would have to pay $10 and show him their identification to gain entry to an upstairs room, per hotel policy, they balked. Angry arguments ensued between Beltran and Alarcon, on the one hand, and Owens. According to Owens, Beltran (referring to Owens) said things like, " '[f]uck that nigger . . . I'm not paying shit' " and " 'you need to call the fucking police, then, because I'm not giving you shit but an ass kicking.' "[5] Beltran was drunk and combative; according to statements later made by Beltran's uncle to Sergeant Kasper, Beltran had already been drinking heavily on the morning of the incident.[6]

Defendant Young worked as a desk clerk and security guard at the hotel, although he was not on duty at the time Beltran and Alarcon arrived. Young lived at the hotel, not as a guest but because he worked there; according to Owens, Young lived somewhere on the third floor. York was living at the hotel, too, in anticipation of being hired as a security guard. Owens, York and Young were personally close. Owens said York and defendant were like brothers; he had known them both since they were young and they referred to him as "uncle."

The Henry Hotel is on Sixth Street. To get into the hotel from the sidewalk, there is a door and an iron gate, which lead into the outer hotel lobby. To get into the inner lobby, there is another locked iron gate. A person who wishes to gain access to the inner lobby of the hotel (and upstairs into the hotel) must be "buzzed in" through this second iron gate. At the back of the inner lobby is a stairwell and an elevator. A person in the

---

[5] Owens attributed these statements to "the shorter guy" or the "little bitty guy," who was identified on the video as Beltran. He identified Alarcon as the taller person with the fisherman's hat.

[6] It was stipulated for purposes of the preliminary hearing that Alarcon and Beltran were under the influence of intoxicating substances, either alcohol and/or other controlled substances, at the time of the events at issue in the case.

4

outer lobby can see people coming out of the elevator or coming down the stairs. The desk clerk's office has a glass window that looks out on the outer lobby. The desk clerk's office has an array of security monitors that display camera views of the hotel, including the interior of the elevator.

The evidence of what happened on the morning in question is primarily based on the soundless videos, which were taken from cameras placed in the interior lobby area of the hotel, the elevator, the seventh floor area, and the outside of the hotel itself; Owens's immunized testimony; and the testimony of Sergeant Kasper.

Beltran and Alarcon came to the Henry Hotel together; it was later discovered that they were there to buy cocaine.[7] They argued with Owens about getting access to the hotel. The argument got heated, with physical threats against Owens and racial slurs.[8] According to Owens, Beltran said he was "the Mexican Mafia and that I would be sorry if I take this any farther, because he would have my ass." At one point, Owens went back into the desk clerk's office and feigned a call to the police. Owens saw on the security monitors that York was coming down the elevator. Owens walked over to the elevator to meet him. Owens gestured to Beltran and Alarcon, and told York that he was "having a problem with . . . these two guys here that won't leave."

Video clips show that York immediately reentered the elevator, exited on the seventh floor, and went running into room 703. (This is the same room that, earlier that morning, York, defendant, and a woman identified as Dizon, were seen entering and

---

[7] At the request of York's counsel and with the agreement of the prosecutor, it was stipulated that if Officer Vizcay of the San Francisco Police Department had been called as a witness, he would have testified to the contents of his police report, which the court was permitted to read and consider as evidence. The report stated in summary, according to Judge Benson, that on August 18, 2014 (shortly after this incident), Alarcon and a Mr. Roosevelt got into a dispute about a bag that was laying in the street and in the course of that, Roosevelt pushed Alarcon, who then lifted his shirt and brandished a black Glock that was in Alarcon's waistband. Roosevelt later fled on foot and identified Alarcon. This incident was admitted as a character trait of the victim pursuant to Evidence Code section 1103.

[8] When Owens was asked whether Beltran and Alarcon threatened that "they'd fuck you up" and "said they'd kill you," Owens answered "yes."

5

exiting.)  Moments later, York ran out of room 703 carrying a gun with an extended magazine in his hand.  Defendant and the woman named Dizon emerged running from room 703 about 15 seconds after York.  Defendant was half dressed, and pulled on a sweatshirt as he moved down the hall toward the stairs.  York went directly to the elevator, and took it back down to the first floor lobby area.  Young ran down the stairs to the lobby.  He got there before York did, spoke to Owens about what was going on, and began arguing with Beltran.  According to Owens, Beltran continued to sound off, telling defendant, to "get the fuck out of my face."

York then arrived downstairs.  As York walked out of the elevator, there was a firearm with an extended magazine visible in his hand.  Defendant turned and looked back toward the elevator as York was walking out of the elevator with the gun.  Defendant and Beltran then physically engaged; defendant pushed Beltran out the door of the hotel and onto the sidewalk.  While this was happening, York approached Alarcon and began throwing punches at him, with the gun visible in York's hands.

The situation was fluid and fast moving.  In the midst of these physical struggles, York's gun was discharged from inside the hotel and apparently through the iron gate in the outer hotel doorway, hitting Beltran in the upper chest.  The video shows a flash, and, according to Owens, there was a loud sound in the lobby when the gun was fired.  Just before he heard the loud noise, Owens heard Beltran asking Alarcon to come out of the building, saying "[f]uck these niggers, man.  We're gonna handle it," and that they were "gonna show" them something "right now."  Alarcon did not hear a shot and did not realize that Beltran had been shot until later when they were out on the street.

Beltran grabbed his chest and ran down 6th Street in the direction of Minna Street.  Young, York, and a man named Ebony Holt (who was also involved in the altercation and later charged) went some distance south toward Minna Street, and then turned around and went back into the lobby of the hotel, where they turned their attention to Alarcon.  Defendant hit Alarcon, and Holt and York joined in; in Owens' words they started "really whupping [Alarcon's] ass."  Owens told his "nephews" (defendant and York) and Holt to stop, and eventually they did.  Alarcon then ran out of the hotel lobby; according to

6

Owens he was "still talking shit" and saying " '[w]e'll be back motherfuckers' . . . [¶] [a]nd, 'Y'all don't know who you fucking with.' " Shortly thereafter, defendant and Owens used a mop and bucket to clean blood off the floor in the hotel lobby. And shortly after that, defendant, York and Dizon are seen on the video camera going back into room 703.

Beltran made his way down the street near the area of the Henry Hotel where his uncle was waiting in a car for him and Alarcon. Beltran died from a gunshot wound to the chest. Alarcon had a bloody nose; he was uncooperative when he was later interviewed by the police and claimed not to remember the events accurately. He said he and Beltran were at the Henry Hotel to buy cocaine.

Sergeant Kasper and other police officers arrived at the Henry Hotel at about 6:20 a.m. that morning and began investigating. A shell casing was recovered in the outer lobby inside the Henry Hotel. Owens at first denied that anything had occurred.

Judge Benson considered the video evidence at the preliminary hearing, and asked to have excerpts replayed, sometimes in slow motion, or paused so that he could focus on the testimony or occasionally ask a question. The prosecutor used the video clips in his closing argument. Judge Benson also reviewed some of the video evidence before issuing his holding order. In all, 14 different video clips of varying duration were offered in evidence.

At the end of the preliminary hearing, Judge Benson held Young to answer only on counts 4 and 5: assault with a semiautomatic firearm against Roger Alarcon (§ 245, subd. (b)), and assault with force likely to cause great bodily injury against Roger Alarcon (§ 245, subd. (a)(4)).[9] The remaining charges against Young were all dismissed;

---

[9] During the prosecution's closing argument at the preliminary hearing, which including replaying portions of the video, Judge Benson commented regarding the assault against Alarcon (count 5) that "I get the sense that—from looking at the video here that you've sort of severed that off as a separate assault because there's an interruption with the shooting and people coming back inside, and then three people seem to go after Mr. Alarcon at that point. Is that what you're thinking?" The district attorney replied, "That's what Count V encapsulates, your Honor." Judge Benson eventually stated in

7

most importantly for this appeal, the count alleging that he was liable for the murder of Beltran. Judge Benson stated that his holdings as to Young were "evidence based, particularly on the specifics as shown in the video cameras that the—that recorded what was happening in this event at the gate. The . . . Court's holdings in this regard or lack of holdings in this regard is based upon the Court's inability to find probable cause." Judge Benson explictly stated that he was not making any express or implied factual findings that would restrict the district attorney's exercise of its discretion under section 739, that "the Court's order to hold or discharge on any defendant on any charge is based on the Court's legal conclusions regarding the presence or absence of probable cause," and that his "findings as to probable cause are based on what I specifically saw in this film and the precise sequence of events."

York was held to answer on several counts, including the murder of Beltran and the arming allegation.

*The District Attorney Files an Information*

On October 21, 2014, notwithstanding the holding order, the district attorney filed an information charging both Young and York with the murder of Daniel Beltran (§ 187, subd. (a); count 1); assault with force likely to cause great bodily injury against Beltran (§ 245, subd. (a)(4); count 2); assault with force likely to cause great bodily injury against Roger Alarcon (§ 245, subd. (a)(4); count 3), assault with a semiautomatic firearm against Beltran (§ 245, subd. (b); count 4); and assault with a semiautomatic firearm against Alarcon (§ 245, subd. (b); count 5). Young was arraigned on the information on October 22, 2014.[10]

---

holding defendant Young to answer on the assault charges as to Alarcon (but not Beltran or the murder count) that "it seems pretty clear to the Court that Mr. Young knew about the gun and he was going along with its use in order to get these two characters out of the hotel, but I cannot make a finding as to probable cause—a probable cause finding as to Count I [murder]. It's easy to do as to the assault charge, but not as far as the [section] 187 [murder].")

[10] Subsequently, Young and York's case was consolidated with that of another defendant, Ebony Holt, and a consolidated information was filed on November 17, 2014.

8

*Defendant Files a Section 995 Motion Which Is Denied*

On December 24, 2014, Young filed a motion to dismiss the consolidated information pursuant to section 995 on the ground that there was insufficient evidence to hold him to answer. Young contended, among other things, that the refiled murder charge against him must have been premised on an aiding and abetting theory, which he argued the prosecution had failed to establish. Young also argued that *People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*) supported dismissing the murder charge.[11]

The district attorney opposed the section 995 motion, contending that the evidence was sufficient to show Young aided and abetted the murder of Beltran under the natural and probable consequences theory of liability. He disputed that *Chun,* which involved felony murder, had any applicability to this case.

Judge Philip Moscone, another very experienced retired superior court judge, heard the section 995 motion in a brief hearing held on the morning of January 30, 2015. Towards the end of the morning session, Judge Moscone indicated that he "did not have the opportunity to see the video, but the research attorney did." No one commented in response to this statement by the court. The court took a recess for lunch, and the matter resumed that afternoon at 2:00 p.m. Judge Moscone commented that he "had a chance to look over the papers and portions of the transcript during the lunch hour," and asked if there was "anything further anyone wants me to consider?" All three defense counsel said no. Young's section 995 motion was denied, with little comment by Judge Moscone: "And I think that—the matter of merger that was discussed in the papers, that doesn't arise at this time but it [m]ight arise at the time of discussion with the Court as far as instructions at that point, depending on what the People's theory is. [¶] It could be refiled because it's transactionally related, and you don't always have to go on a felony

Young waived instruction and arraignment on the consolidated information on November 17, 2014.

[11] In *Chun*, the Supreme Court held that when the underlying felony is assaultive in nature, the felony merges with the homicide and cannot be the basis of a second degree felony-murder instruction. (*Chun*, *supra,* 45 Cal.4th at p. 1200.)

9

murder basis. There's a natural probable consequences of the assault, which I think is sufficient evidence to show."

*Defendant Files a Motion to Reconsider the Section 995 Motion*

On May 13, 2015, Young filed a motion for reconsideration of his earlier section 995 motion, "based on the general concept of due process and the fact that Judge Moscone ruled on defendant's 995 motion without actually viewing the video evidence introduced at the preliminary hearing which was central to the resolution of the issues raised in the defendant's 995 motion." The motion did not address why Young's counsel had not raised this point earlier, since it was apparently known at the time of the section 995 hearing before Judge Moscone that he had not watched the video evidence. Defense counsel conceded without more that defendant was "time-barred from challenging the ruling of Judge Moscone by seeking a writ pursuant to Penal Code § 1510." Section 1510 permits review of the "denial of a motion made pursuant to Section 995 . . . prior to trial only if the motion was made by the defendant in the trial court not later than . . . 60 days following defendant's arraignment on the information . . . if a felony, unless within these time limits the defendant was unaware of the issue or had no opportunity to raise the issue." Offering no explanation, defendant apparently conceded that the section 995 motion had not been made within this time frame.[12]

The district attorney opposed the motion for reconsideration on the ground that it was "procedurally incorrect." He argued that defendant should have filed a writ of prohibition to the Court of Appeal pursuant to section 999, subdivision (a) within 15 days of the unfavorable ruling on his section 995 motion, and having failed to do so should not be permitted to file a motion to reconsider. The district attorney also argued that the reviewing judge was not required to review all of the evidence in considering a section 995 motion, and that having apparently found probable cause based on the transcript of the preliminary hearing alone, no further inquiry was needed.

---

[12] Defendant was arraigned on the information on October 22, 2014, and filed the section 995 motion on December 24, 2014; it was heard on January 30, 2015.

10

Judge Moscone heard the motion to reconsider on June 12, 2015, and granted the motion. He indicated that he was "not sure whether I actually saw any of the video clips or whether I just as [sic]—you know, I was reading the testimony. I kind of have a mental image of what was going on."[13] Young's defense counsel opined that Judge Moscone might have been thinking of an excerpt of video that was shown to him in connection with the subsequent change of plea of defendant Holt, who had been charged in connection with this incident.

In any event, while Judge Moscone acknowledged that it was "kind of a low standard" to determine in a section 995 motion whether there were grounds to show that an offense had been committed, he concluded that "given the importance of the case and nature of the charges, I probably should take another look at it with the videos." He continued, "I'm not saying the decision is going to be any different from what it was before. . . . [¶] It's just a question of—I don't think I reviewed the things because they weren't submitted at the time that I had the review. And so if we have them now, it's the least I can do . . . [¶] is take a look at them.

*Judge Moscone Reconsiders the Section 995 Motion*

Judge Moscone subsequently conducted a very brief hearing on the merits of the renewed section 995 motion on August 3, 2015. Neither counsel presented further argument at that time. Judge Moscone stated, "This was a motion to reconsider a prior ruling on a 995 motion based on the Court's inability at that time to view the videos prior to the original hearing. [¶] So the matter was then submitted, and the Court did view the videos. And I also reviewed the reporter's transcript of the preliminary hearing. [¶] Having reviewed that, the Court does not find sufficient evidence to find reasonable and probable cause to hold Mr. Young to answer to the charge alleged in Count 1, that is

---

[13] At a pretrial hearing 10 days earlier addressing the district attorney's request for a continuance for time to respond to the motion for reconsideration, Judge Moscone appeared to acknowledge that he had not viewed the video at the time of the hearing on the original 995 motion. "We do not have video, and I didn't have the video last time, which is why I indicated on the record that I hadn't reviewed it."

11

a violation of Penal Code section 187." The balance of the section 995 motion addressing the other charges in the information against Young was denied, without explanation. Judge Moscone thus let stand the remaining charges against defendant, which included assault with force likely to cause great bodily injury against Beltran and against Alarcon, and assault with a semiautomatic firearm against Beltran and against Alarcon.

The People then timely filed this appeal.

## DISCUSSION

I. *The Trial Judge Did Not Err in Reconsidering His Earlier Order.*

The Attorney General contends that Judge Moscone was without authority to reconsider his prior ruling on the section 995 motion, and the order must be reversed on this ground without ever reaching the merits of the section 995 motion.

It is well established law that in criminal cases a trial court has the power to reconsider its own interim rulings, with few limits. (*In re Alberto* (2002) 102 Cal.App.4th 421, 426; *People v. Castello* (1998) 65 Cal.App.4th 1242, 1246 (*Castello*).) Notwithstanding, the Attorney General contends that Judge Moscone had no power to reconsider the section 995 motion here because it was not based on any "changed circumstances," and because it was a "final order" not subject to reconsideration.

The Attorney General relies primarily on *In re Kowalski* (1971) 21 Cal.App.3d 67 (*Kowalski*), but that case is distinguishable. *Kowalski* was a writ proceeding where one judge in effect reconsidered the section 995 ruling of another judge and reached a different result. Defendant Kowalski had been charged with lewd and lascivious behavior with minors. The first judge (Low) *denied* a section 995 motion to dismiss the indictment. The case went to trial before a second judge (Fisher), who granted a motion for mistrial and then, "in substance, invited" Kowalski to renew his section 995 motion. (*Id*. at p. 69.) Judge Fisher then *granted* the section 995 motion and dismissed the case. For reasons not explained in the opinion, two days later the parties were before Judge Low again. Although defendant contended that the case had been dismissed by Judge Fisher, Judge Low disagreed, stating that Judge Fisher had acted in excess of jurisdiction

12

in granting the section 995 motion, and the order of dismissal was void. Judge Low then set a new trial date and bail. Kowalski petitioned for a writ of habeas corpus on the ground that Judge Fisher had jurisdiction to grant the second section 995 motion and dismiss the case, and another judge on the same court (Low) couldn't simply set that order aside. The Court of Appeal agreed, holding that Judge Fisher did not commit "jurisdictional error" in granting the section 995 motion, and his order was " 'binding' " and should have been followed until such time as it was overturned. (*Id*. at p. 71.) The court in *Kowalski* noted that the People were "not without a remedy;" they could have filed an appeal from Judge Fisher's dismissal order pursuant to section 1238, subdivision (a)(1), but failed to do so and let it become final. As such, because the case had been dismissed by Judge Fisher, and Judge Low's orders setting a new trial date and fixing bail were void, the writ of habeas corpus was granted.

Along the way to its holding, the *Kowalski* court cited a rule of *civil* procedure for the proposition that "[o]rdinarily, a motion under section 995 should not be renewed unless changed circumstances are shown which have a significant bearing on the question whether a defendant was indicted or committed without probable cause. (Cf. Code Civ. Proc., § 1008.) Such circumstances might exist, for example, if there were a substantial change in the law between the time of the first and second motions, which made inadmissible much of the testimony considered by the grand jury or magistrate." The *Kowalski* court concluded that "[i]n this case, without any showing of changed circumstances, Judge Fisher considered the matters already ruled on by Judge Low and reached a different decision. This was an abuse of discretion and was error, but it was not a jurisdictional error." (*Kowalski, supra,* 21 Cal.App.3d at pp. 70-71.)

Thus, *Kowalski* is distinguishable because it arose in the context of a situation where one judge reconsidered and in effect overruled a different judge's order. That is not the case here, where Judge Moscone reconsidered his own order after he believed he had failed to consider the video evidence. Further, *Kowalski's* statement that a section 995 motion may be renewed ordinarily only if there are changed circumstances relied by analogy to Code of Civil Procedure section 1008, which governs motions for

13

reconsideration in civil cases. As other courts have concluded, this is a thin reed on which to base a rule in a criminal case.

In *Castello, supra,* 65 Cal.App.4th at page 1245, a trial court initially found true an allegation of a prior conviction, but in response to a later motion by defendant reconsidered its decision and reversed its finding. The People argued that Code of Civil Procedure section 1008 extended to criminal cases and the trial court did not have the power even to reconsider an interim ruling, also relying on *Kowalski*. The court in *Castello* rejected this argument, and because its reasoning is directly applicable to this case, we quote it extensively: "In general, to decide the proper rule of criminal procedure by reliance upon rules of civil procedure 'would be to ignore the underlying rights of the presumption of innocence and proof beyond a reasonable doubt.' (*People v. Belton* (1979) 23 Cal.3d 516, 522.) *Gonzales v. Superior Court* (1935) 3 Cal.2d 260, 263–264, concluded that only those parts of the Code of Civil Procedure which are expressly made applicable to penal actions apply to criminal cases. As stated in *Smith v. Superior Court* (1981) 115 Cal.App.3d 285, 291, '[t]he rationale [of *Gonzales*] should apply . . . to preclude operation of other Code of Civil Procedure sections . . ., such as section 1008' since section 1008 is not so incorporated. (Accord, *People v. Glimps* (1979) 92 Cal.App.3d 315, 325, fn. 6.)

". . . [*Kowalski, supra,*] 21 Cal.App.3d 67, 70, reasoned that a motion under . . . section 995 should not be renewed unless changed circumstances are shown, using [Code of Civil Procedure] section 1008 by analogy only. (See Cal. Style Manual (3d ed. 1986) § 101, p. 69 [meaning of 'cf.'].) The court in *People* v. *Locklar* (1978) 84 Cal.App.3d 224, 230 relying on [*Kowalski*], did imply in dicta that section 1008 applied in a criminal case. However, this dicta, based on a misreading of [*Kowalski*] does not bind us. (See, e.g., *Hart v. Burnett* (1860) 15 Cal. 530, 598–599.) Moreover, these cases primarily concern the rule that one trial court judge may not reconsider and overrule a ruling of another judge. (See, e.g., *Greene v. State Farm Fire & Casualty Co.* (1990) 224 Cal.App.3d 1583, 1588–1589.)

14

"The California Supreme Court has often recognized the 'inherent powers of the court . . . to insure the orderly administration of justice.' (*Hays v. Superior Court* (1940) 16 Cal.2d 260, 264; see also *Bank of America v. Superior Court* (1942) 20 Cal.2d 697, 702 [court has power to change interim rulings]; *Millholen v. Riley* (1930) 211 Cal. 29, 33–34.) In criminal cases, the court has acknowledged 'the inherent power of every court to develop rules of procedure aimed at facilitating the administration of criminal justice and promoting the orderly ascertainment of the truth.' (*Joe Z. v. Superior Court* (1970) 3 Cal.3d 797, 801–802; *Powell v. Superior Court* (1957) 48 Cal.2d 704, 708.) . . .

"A court's inherent powers are wide. (See, e.g., *Asbestos Claims Facility v. Berry & Berry* (1990) 219 Cal.App.3d 9, 19–24, disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896–897; *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377-1378.) They include authority to rehear or reconsider rulings: '[T]he power to grant rehearings is inherent,—is an essential ingredient of jurisdiction, and ends only with the loss of jurisdiction.' (*In re Jessup* (1889) 81 Cal. 408, 468; accord, *Metropolitan Water Dist. v. Adams* (1942) 19 Cal.2d 463, 469.) ' "One of the powers which has always been recognized as inherent in courts, which are protected in their existence, their powers and jurisdiction by constitutional provisions, has been the right to control its order of business and to so conduct the same that *the rights of all suitors before them may be safeguarded.* This power has been recognized as judicial in its nature, and as being a necessary appendage to a court organized to enforce rights and redress wrongs." ' (*Lorraine v. McComb* (1934) 220 Cal. 753, 756, quoting *Ringlander v. Star Co.* (1904) 98 App.Div. 101, 104, italics added.)

"Moreover, even if [Code of Civil Procedure] section 1008 were deemed applicable to a criminal case, that statute, by its express terms, governs only a litigant's ability to renew a motion or advance an application, not the court's inherent power to reconsider its own interim rulings. [Citations.]

"A court could not operate successfully under the requirement of infallibility in its interim rulings. Miscarriage of justice results where a court is unable to correct its own perceived legal errors, particularly in criminal cases where life, liberty, and public

15

protection are at stake.  Such a rule would be ' " . . . a serious impediment to a fair and speedy disposition of causes. . . ." [Citations.]' (*De La Beckwith v. Superior Court* (1905) 146 Cal. 496, 500, quoting *Richman v. Board of Supervisors of Muscatine County* (1889) 77 Iowa 513, 524.)." (*Castello, supra,* 65 Cal.App.4th at pp. 1246-1248, fn. omitted.)

The logic of *Castello* applies to this case.  Judge Moscone came to perceive that he had made a legal error in not reviewing the critical videotape evidence essential to determining whether to hold Young to answer for murder.  Neither *Kowalski* nor Code of Civil Procedure section 1008 stands in the way of his discretion to reconsider his original ruling.

The Attorney General also argues that it was error to reconsider the section 995 motion because it was a "final" not an "interim" order.  This argument is plainly incorrect.

"Generally speaking, courts may correct judicial error in the making of interim orders or in limine rulings until pronouncement or entry of a judgment.  [Citations.]  On the other hand, judicial error in the making of a final order or judgment 'may not be corrected except pursuant to statutory procedures' or on the limited grounds available for a collateral attack.' [Citations.]" (*People v. DeLouize* (2004) 32 Cal.4th 1223, 1231, fn. omitted (*DeLouize*).)

In *DeLouize*, our Supreme Court addressed whether in a criminal case a court is prohibited from reconsidering its order granting a new trial.  The trial court had granted defendant's motion for new trial on the ground that, based on a recently published Court of Appeal decision, the trial court had committed structural error in misinstructing the jury.  The prosecution (after the time to appeal the order granting new trial had passed) then made a motion to reconsider the order granting new trial on the grounds that a second Court of Appeal decision had concluded that the jury instruction was valid, the Supreme Court had ordered depublication of the first Court of Appeal decision that had been the basis for the new trial order, and the Supreme Court had itself issued a decision

16

stating that the jury instruction at issue was adequate. (*DeLouize*, *supra*, 32 Cal.4th at p. 1227.)

The court in *DeLouize* held that an order granting a new trial is "not final in the sense of being a final resolution of the case or a final determination of the defendant's guilt or innocence. On the contrary, an order granting a new trial 'does not finally dispose of the matter.' " (*DeLouize*, *supra*, 32 Cal.4th at p. 1231.) Section 1180, in fact, states that it " 'places the parties in the same position as if no trial had been had.' " Thus, *DeLouize* concluded that the order granting new trial is an "interim order in the sense that it requires further proceedings before the case may be resolved and judgment may be pronounced." (*Id.* at p. 1231.)

*DeLouize* explained that whether the order was appealable or not was not a bright line test of a final versus an interim order. "Although courts have sometimes used appealability as a test for distinguishing final orders from interim orders [citations], a better approach here, we think, is to analyze the issue in terms of the policies underlying the general concept of finality. Orders and judgments are deemed final in the superior court, and not subject to reconsideration by that court, to preserve confidence in the integrity of judicial procedures and to avoid the delays and inefficiencies associated with repeated examination and relitigation of the same facts and issues. [Citation.] The concept of finality 'rests upon the sound policy of limiting litigation by preventing a party who has had one fair adversary hearing on an issue from again drawing it into controversy and subjecting the other party to further expense in its reexamination." (*DeLouize*, *supra*, 32 Cal.4th at p. 1232.)

Thus, the court reasoned that even though the motion granting the order for new trial was appealable, new trials "substantially prolong criminal proceedings," and "allowing trial courts some authority to reconsider and to vacate orders granting new trials may lead to earlier resolution of the matter and thereby promote the interests underlying judicial finality rules." (*DeLouize*, *supra*, 32 Cal.4th at p. 1232.)

Whether this particular order denying a section 995 motion is interim or final is an easily answered question. When a defendant moves to dismiss an information under the

17

circumstances of this case, "the question of his guilt or innocence is not before the court." (*People v. McKee* (1968) 267 Cal.App.2d 509, 514.)  The denial of a section 995 motion decides no more than that there is "reasonable or probable cause to believe the defendant guilty of the offense charged," with the result that the criminal information goes forward as charged.  (*Id*. at p. 515.)  Put another way, in the language of *DeLouize*, an order denying a section 995 motion is "an interim order in the sense that it requires further proceedings before the case may be resolved and judgment may be pronounced." (*DeLouize*, *supra*, 32 Cal.4th at p. 1231.)

Although the Attorney General acknowledges that whether an order is appealable is not determinative as to whether it is final or interim for purposes of reconsideration by a trial court, she nonetheless urges that we take into account that there is a statutory provision permitting pretrial review of the denial of section 995 motions and defendant did not avail himself of it in this case.  She concludes that allowing defendant to move for reconsideration rather than timely filing a motion for pretrial review pursuant to section 1510 makes the limitations of section 1510 "superfluous" and only encourages repetitive litigation in the trial court.

When that argument is unpacked, it is unpersuasive.  There is no clear statutory time period in which to file a section 995 motion; section 997 states it must be heard "prior to trial."[14]  *If* a defendant makes a section 995 motion within the statutory time period provided by section 1510, he leaves open the possibility of seeking pretrial appellate review of an unfavorable denial of a section 995 motion.  The avenue that is available is a writ of prohibition, pursuant to section 999a, which itself must be filed within 15 days after the section 995 motion is denied.  (§ 999a; 4 Witkin, Cal. Criminal Law (4th ed. 2015) Pretrial Proceedings, § 271, p. 538 [defendant may seek prompt

---

[14] The timeliness of defendant's original section 995 motion is not an issue in this case, and thus we need not and do not consider the circumstances under which a section 995 motion might be considered untimely.  (See, e.g., *People v. Arjon* (2004) 119 Cal.App.4th 185, 190-191 [under the facts of this case, not an abuse of discretion to refuse to consider section 995 motion immediately before trial].)

review of order denying section 995 motion].)  If a defendant makes a section 995 motion *after* the time period provided by section 1510, he may not seek pretrial appellate review of the denial of a section 995 motion.  But that does not mean that a defendant is precluded from making the section 995 motion to begin with.  (See *Fleming v. Superior Court* (2010) 191 Cal.App.4th 73, 103 [" '[s]ection 1510 does not prevent a defendant in a felony prosecution from making a section 995 motion at any time before trial; it operates only to preclude pretrial appellate relief from an order denying one which (1) was made more than 60 days after his arraignment and (2) does not fall within either of the exception for which section 1510 expressly provides' "], citing *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 950-951.)

For whatever reason, defendant Young apparently made his original section 995 motion after the time when he could avail himself of pretrial appellate review of an unfavorable decision.[15]  But he made the section 995 motion well in advance of trial and the prosecution did not challenge its timeliness.

The Attorney General is incorrect that the course defendant Young followed made section 1510 "superfluous," as if that characterization has some relevance to the outcome of this appeal.  True, because of the timing of his initial section 995 motion defendant cannot avail himself of pretrial review pursuant section 1510, but that is neither here nor there for purposes of answering the question whether Judge Moscone could decide to reconsider his prior ruling on the section 995 motion.  Thus we conclude that the Attorney General's argument that defendant's "failure to fully avail himself of his statutory remedy does not allow him a different remedy—reconsideration—that the court has no authority to provide" is without merit.

But let us not lose sight of the big picture in this unusual case. In ruling on the section 995 motion the first time, Judge Moscone did not view the key evidence in the

---

[15] We describe the pretrial review scheme only by way of background to address the Attorney General's arguments.  We emphasize that we do not know why defendant filed the initial section 995 motion when he did, and whether he could have found a basis for pretrial review is not in the record—or an issue—before us.

case.  It did not take much to persuade him that he should reconsider the motion, even though he wasn't convinced that it would change the outcome of his decision.  Judge Moscone's conscientious acknowledgment that he needed to review the tape is what "preserve[s] confidence in the integrity of judicial procedures."  (*DeLouize*, *supra*, 32 Cal.4th at p. 1232.)  On the facts of this case, we cannot say that he had no authority to reconsider his prior ruling.

II.     *The Trial Judge Did Not Err When, Upon Reconsideration, He Granted the Section 995 Motion to Dismiss the Murder Count*

        A.     *Standard of Review*

At the conclusion of the preliminary hearing, Judge Benson dismissed count 1, the murder count, for insufficient evidence.  Judge Benson made no factual findings with regard to the charges.  The district attorney then realleged the murder count, as he was authorized to do pursuant to section 739, which permitted him to include in the information "either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed."

Section 995 requires an information to be set aside if the defendant "had been committed without reasonable or probable cause."  (§ 995, subd. (a)(2)(B).) " ' " 'Reasonable or probable cause' means such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." [Citation.]' " (*People v. Mower* (2002) 28 Cal.4th 457, 473.) In reviewing the trial court's ruling on a section 995 motion, we directly review the determination of the magistrate.  (See *People v. Barba* (2012) 211 Cal.App.4th 214, 227-288.)

Where, as here, a district attorney files an information in the superior court after preliminary hearing with an offense that was not included in the commitment order signed by the magistrate, "the court must uphold the information if the evidence adduced at the preliminary hearing is sufficient to support the new or additional charge. [Citation.]" (*People v. McKee, supra,* 267 Cal.App.2d at p. 514.)  " 'Thus, when section

20

739 and . . . section 995 are read conjointly, it follows that the superior court is likewise not bound by the view of the committing magistrate; it too should uphold the information as to any offense charged in the information of which any reasonable construction of the evidence adduced at the preliminary hearing admits. In other words, if the defendant moves to dismiss the information under these circumstances, the question of his guilt or innocence is not before the court nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. On the contrary, the court should decide from the evidence adduced at the preliminary hearing, without attempting to reconcile conflicts or judge the credibility of the witnesses, whether there is reasonable or probable cause to believe the defendant guilty of the offense charged. And, there is sufficient evidence to require the superior court to deny defendant's motion if it raises a clear and distinct inference of the existence of the essential elements of the crime charged [citation].' [Citation.]" (*People v. Barba, supra*, 211 Cal.App.4th at p. 227-228, quoting *People v. McKee, supra,* 267 Cal.App.2d at pp. 514-515, fns. omitted.)

B.      *Aider and Abettor Liability*

Young was charged with murder, apparently on the theory that he aided and abetted York's assault with a firearm, and that the murder of Beltran was a natural and probable consequence of the assault. The evidence is undisputed that Young was not the shooter.

While "[t]he actual perpetrator must have whatever mental state is required for each crime charged," the requirement for an aider and abettor is to " 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [(*Beeman*)].)' " (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 (*Mendoza*).)

Once the necessary mental state is established, " 'a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act

21

be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 261 (*Prettyman*), quoting *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) "[T]he natural and probable consequences doctrine 'allows an aider and abettor to be convicted of murder, without malice, even where the target offense is not an inherently dangerous felony.' " (*People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1026, quoting *People v. Culuko* (2000) 78 Cal.App.4th 307, 322.) As our Supreme Court noted in *Prettyman*, decisions involving the natural and probable consequences doctrine "commonly involved situations in which a defendant assisted or encouraged a confederate to commit an assault with a deadly weapon or with potentially deadly force, and the confederate not only assaulted but also murdered the victim." (*Prettyman*, *supra*, 14 Cal.4th at p. 262.)

"[W]hen a particular aiding and abetting case triggers application of the 'natural and probable consequences' doctrine, the *Beeman* test applies, and the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*Prettyman, supra,* 14 Cal.4th at p. 262, fn. omitted.)

Whether murder is a natural and probable consequence of a target crime is an objective determination. "On the issue of foreseeability the 'question is not whether the aider and abettor *actually* foresaw the . . . crime, but whether, judged objectively, it was *reasonably* foreseeable.' " (*People v. Karapetyan* (2006) 140 Cal.App.4th 1172, 1177, quoting *Mendoza, supra,* 18 Cal.4th at p. 1133.)

22

C. *Analysis*

We conclude that Judge Moscone did not err when, upon reconsideration of the section 995 motion, he dismissed the murder charge as to defendant Young. We note at the outset that the impression of the evidence that one gets from reading the prosecution's opposition to the section 995 motion is, in several important respects, different from watching the video excerpts.

This much is clear. On the morning in question, Owens was threatened by two men who refused to leave the hotel (Alarcon and Beltran) and was unable to handle them on his own. Owens told York that he was having problems with these two men. Owens does not remember what he told York, and doesn't remember telling him to get a firearm or to get defendant Young. But Young's "job" was as a clerk and "like a security guard." Owens had "trained" him, and Young lived and worked at the Henry Hotel. There was no other witness who testified on this subject.

The video excerpts show that York immediately went upstairs to the seventh floor and ran to the room on the seventh floor that defendant, York, and a woman had been seen entering earlier in the pre-dawn hours of that morning. We do not know what York said to defendant in room 703. York was only in the room for a matter of seven or eight seconds. But we can draw an inference that he said something to Young that conveyed urgency about something in the lobby because, well less than a minute later, defendant Young left room 703 half dressed, pulling on a sweatshirt, and hurried downstairs to the lobby. We infer from their actions that defendant and York were reacting to something Owens told York about what was going on in the lobby. But it is sheer speculation that defendant and York agreed in those split seconds on the seventh floor of the hotel that they were going to assault Beltran and Alarcon with a firearm, or even that defendant knew York left room 703 armed.

In the trial court, the prosecutor wrote in opposition to the original section 995 motion that the "target or intended crime was an assault with a firearm; the non-target crime was the resulting foreseeable murder. *It is abundantly clear from the video that*

23

*Joseph Young provided a loaded handgun to York and rushed to join in on the assault*." (Emphasis added.)

We have viewed all of the video excerpts (as did Judge Benson at the preliminary hearing, and as did Judge Moscone upon his reconsideration of the section 995 motion), and there is simply nothing remotely like this on the video. Young is *never* seen providing a handgun to York, loaded or not. Not surprisingly, the Attorney General has not pressed this argument on appeal.

In the trial court, the prosecutor elaborated in written opposition to the original section 995 motion that "York entered Young's room; inferentially a short conversation took place between Young and York, and what occurs after this provides the foreseeability. York is provided with the handgun by Young or he retrieves a large handgun with an extended magazine from Young's room. In either instance, Young has the knowledge of the handgun and its intended purpose—to assault the individuals downstairs. How does one know this? Because both Young and York emerged moments later with a single purpose in mind—to bring a loaded gun with an extended clip to an argument. York ran out first, followed by a half-dressed Young who bounded down the stairs to confront the unruly victims." The prosecutor wrote that when York came out of "Young's room" he was carrying a gun "in plain sight." Again, having viewed all of the video evidence (as did Judge Benson when he held the preliminary hearing), we can state that this misdescribes the video evidence.

York and Young "emerged" from the room separately. What video footage there is shows that York ran out of room 703 first, carrying a gun down at his side that was "in plain sight" to the surveillance cameras, but not at that point to defendant Young. York left room 703 alone, and went quickly down the hall and straight into the elevator. More than 15 seconds later defendant and Dizon came running out of room 703. The timing is important, because by this time, York (and the gun) were not in Young's sight. When Young got to the top of the stairs on the seventh floor, York was already in the elevator. Thus, from the time York was outside room 703 until the time York got off the elevator in the lobby, Young could not have seen the gun in York's hand, or had any discussion

24

with him as to what, if anything, each intended to do. We know this from video excerpts taken from two different surveillance cameras from two different perspectives on the seventh floor. No reasonable inference can be drawn to the contrary. Thus to the extent that the inference argued by the district attorney in opposition to the section 995 motion is drawn from the evidence we have described thus far (i.e., that defendant Young and York "joined into an agreement to assault the victims with a firearm"), it is unsupported.[16]

The supposed significance to be drawn from what happened on the seventh floor carried through the rest of the district attorney's argument to the trial court in opposition to the section 995 motion. The district attorney argued that the "actions of Young in the lobby *corroborate the inference* that Young foresaw what was about to occur when he emerged from his hotel room rushing downstairs," relying on the discredited arguments about the evidence that we have described above.[17] (Emphasis added.)

The prosecution argued in opposition to the section 995 motion that defendant was "waiting for York to arrive with the gun before physically attacking [Beltran]. Both York and Young had like-minded intentions because the moment that York emerged from the elevator and Young looked over his shoulder to see York with the gun, Young began the assault with the handgun as not only an aider and abettor but also a principal. . . . Young starts the assault and York sees this and begins to assault Alarcon with the handgun."

_____

[16] The Attorney General also relies heavily on the assertion "[t]hat defendant knew York had a gun was demonstrated by the fact *they came out of the room together* while York was holding the gun *in plain sight*." (Emphasis added.) For the reasons we have described above, the video evidence does not support drawing this inference.

[17] What happened on the seventh floor of the hotel immediately before the incident was the essential basis for the opposition to the section 995 motion. In summing up the evidence in its opposition brief, the prosecutor described the "magistrate's failure to hold Young responsible for furnishing the gun to York and then running to the lobby to join in on the assault" as "erroneous," in light of the "low standard for a holding order." These actions, according to the prosecution, were "sufficient from a probable cause standard to show circumstantially that Young knew that York intended to use the gun in the planned assault of the victims."

25

Again, this argument presumes that defendant Young already knew York had a gun. We conclude that it is not reasonable to infer from the evidence that Young "waited" to embark on the agreed-upon physical attack until the gun arrived. Owens testified that when defendant Young arrived in the lobby, Owens told him what was going on, and asked him "if he could please let these two guys that was on the opposite side of the gate know that I am not lying to them about our policy at nighttime as far as visiting." According to Owens, Young agreed; " '[y]eah, sure, I'll do that for you.' " Also according to Owens, Young "went outside the gate, right to the guys, and he started telling them . . . exactly what I told them" about the nighttime policy. Young met with a hostile response. One of them said to defendant Young " '[m]an, get the fuck out of my face.' " According to Owens, this was "the bell" that "angered" Young, and he "immediately got into a fight with him."[18] The video excerpts show that defendant Young got to the lobby first and immediately verbally engaged with Alarcon and Beltran, while standing in the threshold of the partially opened interior lobby gate. Owens was there too, standing in the outside part of the lobby near Alarcon and Beltran.

York arrived downstairs in the lobby by elevator about 10-12 seconds after Young had begun engaging with Alarcon and Beltran. At that moment, defendant Young glanced back over his shoulder for a split second looking toward the elevator. There is no sound on the video, and no apparent non-verbal communication between York and defendant Young. Nor was there any testimony from Owens as to whether either said anything to the other. As York left the elevator and approached the outer lobby with a gun, defendant Young moved from his position and pushed Beltran out of the way, out of the lobby and onto the sidewalk. Judge Benson aptly described this part of the video as looking like Young "forcibly ejected [Beltran] out onto the street." Owens agreed in his

[18] Owens described his own anger and compared it to Young's: "That was the bell, meaning that the dude immediately angered—angered Mr. Young when he said that, you know, because it's like—it's like with me, the same thing I tried to explain . . . with me. I was so angry, I wanted to jump on the dude calling me these niggers and—and what he could do. So that [Young] is a younger man, like he's a younger man, and he immediately got into a fight with him."

26

preliminary hearing testimony that this was what Young was "trained to do in these kind of circumstances."[19]  Judge Benson again aptly described the video excerpt of the seconds-long encounter between defendant and Beltran after York arrived as "a lot of swinging.  I don't know if Mr. Young connected much.  I don't think either of them laid a glove on each other.  There's a lot of shoving and swinging."[20]

While defendant Young pushed Beltran out the door and onto the sidewalk, the video evidence shows that York, with gun in hand, assaulted Alarcon inside the hotel lobby.

This was a fluid and very fast moving situation, and these video excerpts are snippets from different camera angles inside the lobby and outside the hotel.  From beginning to end the physical confrontation was only a few minutes.  Because we give no credit to the prosecution's unproven assertions that it was Young's gun, that he gave it to York, and that it was in Young's plain sight on the seventh floor, the evidence necessary to hold Young to answer for the murder charge depends upon whether in Young's split second glance backward to the elevator and what immediately thereafter transpired, a reasonable inference can be drawn that defendant and York agreed to criminally assault Beltran and Alarcon and that in the prosecutor's words "it was foreseeable to Young that Beltran would be killed during the assault in which [Young] participated" based "on the theory that Young was an aider and abettor."

---

[19] As we have described, Judge Benson paid close attention to the video evidence. This exchange occurred when Owens was testifying at the preliminary hearing and being asked questions about the video excerpts.  While the video was stopped momentarily, Judge Benson asked Owens "[d]oes it appear to you that Mr. Young, at what we've just seen, forcibly ejected the shorter guy [Beltran] out onto the street?"  To which Owens replied, "It seems like that," and the court responded, "Thank you.  I just wanted to make sure what I was looking at."  Defense counsel then followed up: "Is that what Mr. Young, in his capacity as being a security person at the Henry Hotel, is trained to do in these kind of circumstances?"  Owens responded, "To remove someone out the building, yes.  Yes."

[20] Judge Benson did not hold defendant to answer on the assault charges against Beltran, but this issue is not before us on appeal.

27

The Attorney General's argument hinges on her contention that it is a reasonable inference that Young waited and did not physically touch the Beltran or Alarcon until he saw York coming down the elevator with the gun. In his respondent's letter brief on appeal, defendant counters that this inference is contradicted by the video (Young actually engaging Beltran and Alarcon at Owens's request) and by Owens's testimony about the insulting words that angered and triggered Young, as we have described above.[21] Although the Attorney General acknowledges in her reply brief on appeal that "[d]efendant extensively discusses the facts, gleaned from the video recordings, arguing a likelihood he was unaware of York's possession of the firearm and lacked the intent to assault the victims," she is dismissive that any of the evidence matters. "Defendant's interpretation of the video recordings, and his assertion that he did not aid and abet York's assault, is of no moment," because Judge Moscone denied the section 995 motion on the assaults with a firearm. From this the Attorney General concludes that Judge Moscone must have found that defendant had "knowledge of York's criminal purpose and had the intent to encourage or facilitat[e] York's assault with a firearm," and that "if there was sufficient probable cause to believe defendant aided and abetted to the assaults with a firearm, then there was equally sufficient probable cause to find defendant liable for murder as a natural and probable consequence of assault with a firearm."[22]

The Attorney General cites no authority for why the unappealed-from portion of Judge Moscone's order on the reconsidered section 995 motion has any relevance to this appeal. We believe there is none. This is a pre-trial appeal by the Attorney General as to one dismissed count; defendant has not (and could not have at this point) cross-appealed the remainder of Judge Moscone's order denying his section 995 motion. Because the

---

[21] The prosecution did not shed any light on the timing issue by asking Owens this ambiguous follow-up question: "And *when* [defendant Young] *immediately* got into a fight, *before* he got into a fight did you see anybody else arrive in the lobby," Owens answered "yes," and identified York and Holt. (Emphasis added.)

[22] We sent a focus letter to counsel before oral argument asking them to be prepared to address to what extent we should consider that defendant Young had been held to answer on counts 4 and 5 of the information.

28

magistrate (Judge Benson) made no express factual findings when he did not hold defendant Young to answer on the murder charge, the district attorney was not bound by the view of the committing magistrate and exercised his discretion pursuant to section 739 to include the murder charge in the information. (*People v. Barba, supra,* 211 Cal.App.4th at p. 227.) On the district attorney's appeal from the trial court's order after a section 995 motion, our task is to " 'decide from the *evidence adduced at the preliminary hearing*, without attempting to reconcile conflicts or judge the credibility of the witnesses, whether there is reasonable or probable cause to believe the defendant guilty of the offense charged.' " (*Id.* at pp. 227-228, quoting *People v. McKee, supra,* 267 Cal.App.2d at p. 514, emphasis added).) And we do this for the only charge at issue before us, which is murder. It is not our task to analyze nor are we bound by Judge Moscone's other rulings.[23]

The Attorney General's disinclination to address the actual evidence presented at the preliminary hearing in this case—including the stark differences between what the video actually shows and how it was characterized in the section 995 motion, and the need to consider what inferences can be drawn from the evidence actually presented at the preliminary hearing—leaves a gap in the Attorney General's analysis and ultimately in the evidence. Our review of the record is that the evidence presented at the preliminary hearing was not enough to hold defendant Young to answer to the murder charge. We express no opinion as to the remaining charges in the case.

Because of our conclusion, we do not address defendant's argument that he should not be held to answer on the murder charge because of our Supreme Court's decision in *Chun*, *supra,* 45 Cal.4th at page 1194.

---

[23] Neither party contends that Judge Moscone made any factual findings. Further, the Attorney General agreed at oral argument that if this court were to affirm the order dismissing the murder count, we would *not* then proceed to consider whether, in light of our holding, there was probable cause to hold defendant Young to answer for the other counts of the information that are not before us on this appeal. It's not our role in this appeal to reconcile our holding with Judge Moscone's ruling on the balance of the section 995 motion.

## DISPOSITION

The trial court's order dismissing the murder charge alleged in count 1 is affirmed. Upon this decision becoming final, our previous order to stay proceedings below is vacated.

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.


A146206, *People v. Young*

31